IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,
    *Plaintiff*,

    v.

SHYKEEM FALLIN,
    Defendant.

Criminal No. ELH-25-00179

**MEMORANDUM OPINION**

After the Supreme Court issued its landmark decision in *New York State Rifle and Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), the Maryland General Assembly amended the State's comprehensive statutory scheme that regulates various aspects of handgun ownership, possession, and use. In February 2025, defendant Shykeem Fallin allegedly violated Maryland law by openly displaying a handgun while on a public street in Baltimore City. In response to a report that defendant was seen displaying a handgun, members of the Baltimore City Police Department ("BPD") stopped the defendant and searched him as well as his car. The vehicle search led to the recovery of a loaded Glock 26, 9mm handgun, along with twelve rounds of ammunition. The Court must now determine, *inter alia*, whether members of the BPD, acting pursuant to Maryland statutory law, violated defendant's rights under the Fourth Amendment.

The recovery of the handgun and the ammunition led to Fallin's federal indictment on June 18, 2025. ECF 1. He is charged with possession of a firearm and ammunition by a prohibited person, in violation of 18 U.S.C. § 922(g)(1). *Id.* The charge relates to events that occurred on February 4, 2025.

Fallin has moved to suppress the evidence recovered from his vehicle. ECF 33 ("Evidence Motion"). In addition, defendant seeks to suppress statements he made at the scene, prior to the

recovery of the handgun.  ECF 31 ("Statement Motion").  The motions implicate two Maryland statutes: the Criminal Law Article ("C.L.") of the Maryland Code (2021 Repl. Vol., 2025 Supp.) and the Public Safety Article ("P.S.") of the Maryland Code (2022 Repl. Vol., 2025 Supp.).

In sum, in the Evidence Motion (ECF 33), defendant contends that the seizure of the defendant, the handgun, and the ammunition were unlawful under the Fourth Amendment because the police lacked reasonable, articulable suspicion to believe that criminal activity was afoot. Fallin acknowledges that, at the time he was seized, the police officers believed he had briefly removed a firearm from his waistband and displayed it.  But, he posits that it is legal in Maryland to carry a handgun, whether concealed or openly, with a permit.  And, central to his position, he argues that the police had no objective basis to suspect that he lacked the requisite permit.

In the Statement Motion (ECF 31), defendant maintains that the stop was custodial; he was not advised of his constitutional rights under *Miranda v. Arizona*, 384 U.S. 436 (1966); the questions posed to him by the police were likely to elicit an incriminating response; and the statements were obtained in violation of his rights under the Fifth and Sixth Amendments to the Constitution.

The government filed a consolidated opposition to the motions.  ECF 34 ("Opposition"). As to the Evidence Motion, the government posits that members of the BPD effectuated a lawful stop of the defendant, pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny.  The government recounts that as BPD Detective Xavier Mendez was operating a CitiWatch camera, he saw defendant openly display a handgun while on a public street in Baltimore, and he relayed that information to fellow officers, who responded to the scene to investigate.  Moreover, the government claims that the search of the vehicle was lawful under *Michigan v. Long*, 463 U.S.

1032 (1983), and its progeny.  With respect to the Statement Motion, the government contends that, for *Miranda* purposes, the defendant was not in custody, nor was he interrogated.

Defendant replied to the Evidence Motion (ECF 37) and to the Statement Motion.  ECF 38.  Thereafter, the defense submitted a supplemental brief in support of the Evidence Motion.  ECF 47.  The government responded.  ECF 53.  Defendant replied.  ECF 54.  Then, on April 15, 2026, defendant submitted yet another memorandum of law with regard to the Evidence Motion.  ECF 58.

The parties have also submitted several exhibits.  These include video footage from Baltimore CitiWatch Camera No. 929, monitored by BPD Detective Mendez during the evening of February 4, 2025, pertaining to the intersection of Edmondson Avenue and Allendale Street in Baltimore City; the Statement of Probable Cause prepared by BPD Detective Paul St. Surin; video footage from the body worn cameras ("BWC") of BPD officers Detective St. Surin, Sergeant Ryan Wagner, and Detective Scott Klein on February 4, 2025; and still photographs derived from the BWC footage.  In addition, the defense submitted the transcript of a hearing held by Judge Russell on March 3, 2025, in the case of *United States v. Lora*, GLR-23-244.  *See* ECF 33-4.

The Court conducted motions hearings on March 6, 2026 (ECF 40) and March 31, 2026 (ECF 55), at which both evidence and argument were presented.  A transcript from the first hearing is docketed at ECF 46; *see also* ECF 47-1 (same).  However, no transcript has been provided for the second hearing.

For the reasons that follow, I shall deny both the Evidence Motion and the Statement Motion.

### I.      Factual Summary[1]

The government called two BPD officers as witnesses at the hearing on March 6, 2026: Detective Xavier Mendez and Detective Scott Klein.  Both witnesses impressed the Court as dedicated law enforcement officers, and both were quite credible in their testimony.

Detective Mendez has been a member of the BPD for thirteen years.  ECF 46 at 18.  He has been assigned to the Southwest District since 2013, and he previously served as a patrol officer in that district for about eight years.  *Id.* at 19, 27.  Mendez testified that he is "really familiar" with the area.  *Id.* at 27.  His police training included drug and gun offenses.  *Id.* at 20.

On February 4, 2025, Mendez was assigned to a unit called the Baltimore Community Intelligence Center ("BCIC"), for the Southwest District.  *Id.* at 18, 19, 24.  In general, the BCIC "gather[s] intelligence and share[s] the information with the members of the [BPD]."  *Id.* at 18; *see id.* at 19.  As of February 2025, Mendez had been assigned to BCIC for five years.  *Id.* at 19.

Mendez's particular duties at BCIC included simultaneous monitoring of multiple video surveillance cameras that are focused on certain city streets in the Southwest District.  *Id.* at 19, 24, 25.  The cameras can be manually controlled; they can rotate 360 degrees; and the operator can "zoom in and zoom out . . . ."  *Id.* at 25.[2]  But, the cameras have no audio capacity.  *Id.* at 26.  The cameras record what they capture and the recordings are preserved for at least 30 days, unless a request to retain is submitted.  *Id.*

As a member of BCIC,  Mendez also works with the BPD's District Action Team ("DAT") for the Southwest District.  *Id.* at 19-20.  He explained that DAT members "focus on the higher

---

[1] The facts are largely undisputed.  But, the parties disagree about Maryland law regarding the wear and carry of handguns, and also about the application of law to the facts.

[2] The cameras are sometimes referred to as "CCTV," an abbreviation for closed circuit television.  *See* ECF 46 at 70.

crime area[s] . . . they're involved in narcotics investigations, firearms investigations, and in the area of patrolling the Southwest District to deter crime." *Id.* at 20. And, according to Mendez, in Maryland one needs a permit to lawfully carry a firearm. *Id.* at 23.

At about 7:00 p.m. on February 4, 2025, Detective Mendez was monitoring CitiWatch Camera No. 929, which was focused on the intersection of Allendale Street and Edmondson Avenue. The area "is considered a high-crime area." *Id.* at 28. Mendez noted that there had been "a recent homicide" about one block away, but he could not recall "the exact date." *Id.* at 27, 48, 49. It is undisputed that a homicide occurred on January 23, 2025, about one block from the intersection in issue.

While Mendez was monitoring CitiWatch Camera No. 929, he noticed an individual, later identified as the defendant (*id.* at 30), standing inside a transparent glass doorway area of a corner store. *Id.* at 29, 30. Mendez observed the defendant adjusting his waistband and sweatshirt in a manner that Mendez believed were "characteristics of an armed person." *Id.* at 29; *see also id.* at 20, 31, 50. Therefore, Mendez manually took over operation of Camera No. 929. *Id.* at 32. He observed Fallin as he stood next to the driver's side of a white car parked on Allendale. *Id.* at 33.

During the hearing, the government played the video from CitiWatch Camera No. 929. *See* Gov't Exhibit 1. I pause to note that the video shows defendant standing next to the driver's door of a white Acura TLX. And, a man in a gray hoodie is standing on the passenger side of the vehicle.

Mendez recounted that, while monitoring the surveillance camera, he believed he witnessed "a CDS transaction" involving the man in "gray sweatpants." ECF 46 at 33.[3] Among other things, he noted that "the male was in possession of a large quantity of U.S. currency." *Id.*

---

[3] "CDS" is a well known abbreviation for "controlled dangerous substance," *i.e.*, drugs.

at 34.  Defendant was not directly involved in the CDS transaction, however.  *Id.* at 33-38. However, Mendez saw defendant again conduct "security checks," which he again described as "characteristics of an armed person . . . ."  *Id*. at 39.  Then, Mendez saw the same individual he believed had just engaged in a CDS transaction pass a "Ziplock designer bag" to defendant.  *Id.* at 39, 40.  He explained that "those designer Ziploc bags are packaging material which are used to package suspected Cannabis."  *Id.* at 40.

Mendez testified that he then saw defendant "reach into his front waistband."  *Id.* at 41.  At that time, defendant removed a handgun with the barrel "facing downward as [defendant] was walking in front of the vehicle."  *Id.* at 42; *see id*. 43, 46, 47, 52, 55.  Referring to the video, Mendez also testified, *id.* at 43:  "You see the bottom portion of the magazine as he's walking toward the vehicle and once he takes a position in front of the vehicle he has his arm facing downward . . . ."  Moreover, Mendez noted that defendant "was staring at" a vehicle as it drove past defendant on Allendale Street.  *Id.*; *see id.* at 47, 60.  Further, Mendez claimed that on the video "you do see [defendant is] gripping the suspected handgun."  *Id.* at 43.  Then, according to Mendez, defendant put the "suspected handgun back in his waistband where he secures it."  *Id.* at 53; *see id*. at 55; *see also* Gov't Exhibit 1 at 19:10-19:23.

Mendez believed, based on his "training, knowledge, and experience," as well as his observations, that Fallin was armed with a handgun.  ECF 46 at 44.  Moreover, based on watching the defendant staring down another driver, Mendez was concerned that the gun could be used.  *Id.* at 46-47.  As to whether defendant had a permit for a gun, Mendez said, *id.* at 44:  "[W]e would have to further investigate that."  He "immediately" contacted Detective St. Surin of the Southwest District DAT by phone and provided a description of the defendant and the defendant's location.

*Id.* at 44, 60.  In addition, Mendez texted a screenshot of what was captured by the video camera, as well as "a short clip of the video."  *Id.* at 44; *see id.* at 59-60.

In the meantime, the defendant entered the driver's side of a black Honda Accord.  *Id.* at 45.  Mendez "was able to capture the license plate."  *Id.*  The unknown male, referenced earlier, who had been involved in the suspected CDS transaction, was "around this vehicle."  *Id.*

On cross-examination, Mendez was clear as to his responsibility as a member of BCIC: "[W]e are the eyes on the street."  *Id.* at 60.  Mendez reiterated that he observed Fallin as he "[r]eached into his front waistband."  *Id.*  Without equivocation, Mendez stated that defendant withdrew the firearm "from his waistband.  It looked like it wasn't secure enough and while he withdrew it from his waistband he displayed it . . . it's a concern . . . especially he's staring down a vehicle that's coming down the street."  *Id.*

Detective Scott Klein has been a member of the BPD since March 2020.[4]  *Id.* at 64.  He has been assigned to the Southwest DAT since May 2024.  *Id.* at 63.  Klein explained that the DAT conducts "proactive patrol" in high crime areas of Baltimore.  *Id.* at 66; *see id.* at 67.  He added that the DAT is "a presence in areas that have been identified as problematic . . . ."  *Id.* at 67.  DAT members undertake foot patrols and conduct car stops, without "requir[ing] direction from a dispatcher."  *Id.*  The DAT unit does not answer calls for service, such as 911 calls.  *Id.* at 66, 67.

Klein indicated that the area of Edmondson and Allendale is an area "of concern," because it is "an area that is high crime in our district."  *Id.*  He explained, *id.*:  "That would be an area that we would go to even if there wasn't a call for service, any time we were out on the street . . . ."  Further, Klein testified, *id.*:  "I know that there's drug activity that occurs right in the 600 block of

---

[4] Previously, Klein was a member of the Baltimore City Fire Department ("BCFD").  ECF 46 at 64.  He served in the BCFD from January 2011 until he joined the BPD in 2020.  *Id.*

Allendale." *Id.* He also related that a homicide had occurred in that area about seven to ten days prior to the incident in issue. *Id.*

According to Klein, in Maryland, one needs a permit to lawfully carry a gun. *Id.* at 65. And, he claimed that Maryland is a concealed carry state, not an open carry state. *Id.* at 66.

Detective Klein recounted that on February 4, 2025, he was directed to the 600 block of Allendale because an individual had displayed a gun. *Id.* at 67-68. He arrived at the scene at approximately 7:30 p.m., along with another police vehicle. *Id.* at 69. Initially, a total of six officers were on the scene. *Id.* at 83. Five were DAT officers, who arrived in two vehicles. *Id.* And, a patrol officer responded by himself in a marked police vehicle. *Id.* at 83. Later, "additional officers showed up." *Id.*

Klein's BWC was introduced as Gov't Exhibit 2. *Id.* at 69-70. As Klein approached the scene, he saw defendant in the driver's seat of a black sedan. *Id.* at 69. Klein related that the BPD officers intentionally blocked defendant's vehicle with their respective police vehicles. *Id.* He explained: "We didn't want there to be an opportunity for this individual to drive away or to even run on foot, so we parked our vehicles in a way that it would make that difficult." *Id.* at 71.

The BWC video footage and the CitiWatch camera show that it was dark outside at the time of the incident. One police vehicle parked directly in front of defendant's Honda. Another pulled to the side of the Honda. And, another police car parked just behind defendant's vehicle. *See* Defense Exhibit 1 (St. Surin's BWC) at 1:15-1:20; Gov't Exhibit 1 (CitiWatch Camera No. 929) at 27:55; ECF 38 at 5. However, there is a wide sidewalk on the passenger side of defendant's car, and it was not blocked by police vehicles. Moreover, the BWC of Sergeant Wagner (ECF 34-3) and the screenshot at ECF 38 at 5 show a man in a gray hoodie standing on the sidewalk, in close proximity to the passenger side of the Honda.

According to Klein, two officers reached into the Honda and held defendant's wrists – one on each side. ECF 46 at 81, 82. Then, defendant was removed from his vehicle, handcuffed, and patted down. *Id.* at 71-72, 85. Klein explained that defendant was frisked because the officers saw on the video that he had a gun. *Id.* at 77. However, no weapon was found on defendant during the frisk. *Id.* at 72, 77.

At the outset of the stop, at least a few of the police officers had drawn their guns. *Id.* at 85-86.[5] Notably, the BWC videos of Detective Klein and Sergeant Wagner show that their weapons were pointed down, towards the ground, and not at the defendant. Indeed, no video shows that any guns were ever pointed at the defendant at any time.

In Klein's testimony, he explained why he drew his weapon, *id.*: "On [sic] incident like this where we suspect someone is armed and not based on characteristics but based on a video of them possessing a firearm or a suspected firearm, it's important for us to keep ourselves safe, the citizens around us safe and also the individual that we're attempting to stop safe. So due to the fact that a firearm is involved, and we're not sure if it's being possessed in a legal manner, my firearm is out until the person in question is detained and we know for a fact there's no possible way that the person can access a firearm." But, once the defendant was secured, Klein holstered his gun. *Id.* at 86, 87. His BWC also shows that Wagner holstered his gun.

As to next steps, Detective Klein testified: "We had responded to the area based on the video where this individual was believed to be in possession of a firearm. And so once we got there and had him stopped, the next important thing for us to determine was was he possessing that firearm legally or illegally and whether he had a permit is going to be how we determine that." *Id.*

---

[5] The body worn cameras of Detective Klein and Sergeant Wagner show that their guns were drawn. It is difficult to determine from the videos whether other officers also drew their weapons and, if so, for how long.

at 72-73. Klein added, *id.* at 73: "[T]he key for us at that point was not whether he had a gun, but whether he had a permit to possess a handgun or a firearm." *Id.* Therefore, Klein asked the defendant if he had a permit for the firearm. *Id.* at 72; *see* Gov't Exhibit 2 at 2:59.

Klein explained that he did not advise defendant of his *Miranda* rights before the inquiry about the permit because "if [defendant] had a permit then a crime wouldn't have been committed." *Id.* at 73. Nevertheless, Klein stated that even if defendant had a permit, "he would have had an educational moment with [defendant] about not brandishing this firearm unnecessarily." *Id.* at 74. But, said Klein, if defendant "had a wear carry permit he would have been free to go." *Id.*

Detective Klein elaborated as to why he did not advise defendant of his *Miranda* rights. *Id.* at 74-75. He analogized to traffic stops, noting that during a traffic stop, a police officer does not read a driver his rights before asking to see the driver's license. *Id.* at 75. Yet, it could be that the driver does not have a license. *Id.* He stated: "So in this situation we're trying to determine whether a crime has even been committed or not." *Id.*; *see also id.* at 79. For this reason, Klein asked Fallin if he had a permit for the gun. *Id.* at 79.

The parties did not provide the Court with transcripts from the various BWC cameras. But, defendant does not challenge the accuracy of the exchanges that appear in the government's Opposition (ECF 34), taken from BPD body worn camera of Detective Klein on February 4, 2025. Therefore, for convenience, I shall quote the exchanges as set forth in ECF 34 at 10-11.

The following exchange transpired between Detective Klein and defendant, after defendant was frisked but *before* the gun was recovered from the Honda, ECF 34 at 10:

Detective Klein:    Do you have a permit for a firearm?

Defendant:    No sir. I don't have a firearm.

Detective Klein:    OK.

\*     \*     \*

Detective Klein:     We're doing an investigation. It appeared that you had a firearm.

Defendant:     Who?

Detective Klein:     You.

Defendant:     When?

Detective Klein:     That's what we're trying to figure out, if you have a permit for a firearm.

Defendant:     Why? I got a firearm?

Detective Klein:     Like I said, it appeared that you had a firearm.

Defendant:     Who said that? You?

Detective Klein:     Our investigation.

Defendant:     Yes sir. I don't.

During the exchange between Fallin and Detective Klein, Fallin also engaged in a brief exchange with Detective Daniel Torres, as follows, ECF 34 at 11:[6]

Detective Torres:     Where you from?

Defendant:     Park Heights.

Detective Torres:     Park Heights?

Defendant:     Yes sir. I didn't even do nothing, sir. I didn't do nothing at all, sir. Nothing.

Detective Torres:     If you didn't do anything then, well, this whole song and dance will be over soon and you'll be out of here.

---

[6] To my knowledge, the government did not provide the BWC of Detective Torres. Nor did the government indicate in its brief that the conversation between Torres and defendant was captured on the BWC of Detective Klein. However, I located the exchange while reviewing the BWC of Detective Klein.

Defendant:                Yes sir.

Based on the exchanges set forth above, the government summarizes the questions posed by Detective Klein to Fallin as follows, ECF 34 at 31 (citing Klein's BWC), without objection from defendant:

1. Detective Klein asked the Defendant [if he] had a permit for a firearm.  Exh. 4 at 19:37:13-18.[7]

2. Detective Torres asked the Defendant where he was from.  *Id.* at 19:38:16-21.

3. Detective Torres asked the Defendant if he had identification.  *Id.* at 19:38:36-39.

4. Detective Klein asked where the Defendant's identification was located and repeated the question after the Defendant answered.  *Id.* at 19:38:40-42.

5. After being told it was in the black Honda, Detective Klein then asked where exactly and if it was in the center console.  *Id.* at 19:38:45-49.

As noted, no weapon was found on defendant during the frisk.  *Id.* at 72, 77.  Klein also related that "a weapons pat-down of the vehicle was conducted."  *Id.* at 77.  The firearm was located under the driver's seat.  *Id.* at 75.  It was not in a locked container.  *Id.*

Detective St. Surin and Sergeant Wagner were the officers who searched defendant's vehicle for the firearm that Detective Mendez had seen while monitoring the CitiWatch camera. ECF 34 at 11.  The government characterizes the search as a "protective sweep."  *Id.* at 10.

The BWC of Sergeant Wagner reflects that he began searching the defendant's car from the passenger side, using a flashlight, as soon as defendant was removed from the vehicle.  During the search, Detective St. Surin moved the driver's seat forward.  Detective Torres, standing outside the Honda and next to Detective St. Surin, spotted the firearm underneath the driver's seat.  *Id.*

---

[7] Klein's BWC is Exhibit 4 to the Opposition (ECF 34).  But, at the motions hearing, it was Gov't Exhibit 2 and Defense Exhibit 3.

Detective St. Surin removed the firearm and secured it. *Id.* The firearm was identified as a Glock 26 9mm handgun bearing serial number AGPU176. It was loaded with one round in the chamber and eleven rounds in the magazine. *Id.* at 1, 11.[8]

According to the government, "the entire encounter" was "relatively brief." It posits that Detective Torres "spotted" the handgun under the driver's seat of the Honda about seven seconds after Klein posed his last question to defendant. The government also notes that Detective Klein exited his squad car at 19:35:52 (citing Klein's BWC); defendant exited his vehicle and was placed in handcuffs by Detective St. Surin at 19:36:30 (citing CitiWatch camera); and the gun was found at 19:38:57 (CitiWatch camera and Klein BWC). Therefore, the gun was found approximately three minutes and five seconds after Klein exited his police vehicle. *See* ECF 34 at 32. Defendant does not dispute this assertion.

The Court's review of the BWC video of Wagner, St. Surin, and Klein confirms the government's summary. The videos also show that the search of the defendant's car began when defendant was removed from the vehicle. The vehicle was searched for about two minutes and 27 seconds before the gun was found.

After the encounter, Detective St. Surin, a member of the DAT for the Southwest District, prepared a Statement of Probable Cause. ECF 33-1. He stated, in part, that when defendant, who was seated in the driver's seat of the Honda, "noti[ced] the emergency lights" of the responding police vehicles, St. Surin "observed Mr. Fallin reach back as if he was attempting to conceal an item behind him in the vehicle." *Id.* at 1. St. Surin also recounted that Mr. Fallin was removed from the vehicle "and a weapons pat down was conducted of his person yielding negative results."

---

[8] ECF 33-1, the Statement of Probable Cause, states: "The handgun was loaded with one spent 9mm casing and twelve live 9mm cartridges."

*Id.*  He explained that, in an "effort[] to locate the handgun," the interior passenger compartment of the vehicle was searched.  *Id.*  A loaded handgun was found "under the driver seat of the vehicle."  *Id.*  Defendant's identification was also recovered in the vehicle.  *Id.*

St. Surin's body worn camera reflects that he commented on defendant's movement in the Honda.  As St. Surin was approaching the scene, he said that the defendant was "moving around" in the vehicle and that defendant "just reached in the back, he's moving around."  *See* Defense Exhibit 1 at 01:11-01:20; *see also* ECF 34-2.

A review of the BWC videos indicates that, during the police encounter with the defendant, the BPD officers were polite and professional.  They did not mistreat the defendant in any way.  Arguably, voices were raised when defendant was directed to exit the vehicle, perhaps because defendant had locked his car and the police could not open the driver's door.  But, there is actually no yelling or shouting by the police officers during the encounter.

Additional facts are included, *infra*.

## II. Maryland's Statutory Scheme as to Handguns

Members of the BPD conducted the stop of defendant and the search of his car after Detective Mendez saw defendant openly display a handgun on a public street.  The United States Supreme Court has said: "Whether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law."  *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979); *see also Ker v. State of Cal.*, 374 U.S. 23, 37 (1963) ("[T]he lawfulness of these arrests by state officers for state offenses is to be determined by [state] law."); *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 761 (7th Cir. 2006) ("Whether an officer has probable cause to arrest depends on the requirements of the applicable state criminal law.").  The conduct of the BPD implicates Maryland law.

As noted, Maryland's statutory scheme regarding handguns is found in both the Criminal Law Article and the Public Safety Article of the Maryland Code.  Title 4 of the Criminal Law Article is called "Weapon Crimes."  Subtitle 1 of Title 4 is called "General Provisions."  Subtitle 2 is titled "Handguns."  Title 5 of the Public Safety Article is titled "Firearms."  Subtitle 3 is titled "Handgun Permits."

In general, the statutory scheme establishes a general prohibition on the wear, carry, and transport of a handgun.  *See* C.L. §4-203(a).  But, the statute also contains multiple exceptions "that function as carve-outs from the general prohibition against the carry of handguns in [C.L.] § 4-203(a)."  *Engage Armament LLC v. Montgomery County, Maryland*, ___ Md. ___, ___, ___ A.3d ___, ___, 2026 WL 1144313, at *22 (April 28, 2026) (alteration added).  One of the exceptions is the possession of a wear-and-carry permit, codified in C.L. § 4-203(b)(2) and P.S. § 5-307.

Before delving into the current statutory provisions, it is helpful to provide some historic context for Maryland's statutory framework regarding handguns.  Maryland has a long "history and tradition" of regulation of handguns.  *Hicks v. State*, ___ Md. App. ___, ___, ___ A.3d ___, ___, 2026 WL 1601794 (June 4, 2026) (en banc), at *34 n.16 (Berger, Friedman, Shaw, J.J., concurring) (hereinafter, "Joint Concurrence").[9]  The regulations date at least to 1886, if not earlier. *See Lawrence v. State*, 475 Md. 384, 402-03, 257 A.3d 588, 598-99 (2021) (citing 1886 Maryland Laws, ch. 375; Article 27, § 36(a) of the Maryland Annotated Code (1957, 1971 Repl.

---

[9] I discuss *Hicks*, *infra*.  In part, it concerns the legality of a *Terry* stop of an individual who was wearing a gun under a shirt, and the outline of the gun handle was visible.  The court majority concluded that the stop was unlawful.  The court also unanimously found unlawful the subsequent search of the defendant's satchel, in which a second gun was found.

Vol.)).[10]  The Maryland legislature enacted a "Pistols" subtitle to the Maryland Code in 1941,
which banned the sale or transfer of a handgun to a person convicted of a crime of violence or a
fugitive. *See* Art. 27, §§ 531(A)–(G), now codified at P.S. § 5-118.  In 1966, the Maryland General
Assembly enacted the 77R Handgun Registration Requirement.

Another "handgun control statute" was enacted in 1972.  *Whack v. State*, 288 Md. 137,
145, 416 A.2d 265, 269 (1988) (citing Ch. 13 of the Acts of 1972, Art. 27, §§ 36B to 36F).  In
particular, in 1972, the Maryland General Assembly enacted Article 27, § 36(B)(b) as "emergency
legislation" to "provide more stringent penalties against those who illegally carried handguns on
the streets of Maryland."  *Lawrence*, 475 Md. at 401-02, 257 A.3d at 598 (citing Senate Bill 205
and House Bill 277, 1972 Leg., 375th Sess. (Md. 1972)).[11]  At that time, Senate Bill 205 added
two sections that would later be recodified as C.L. §§ 4-203 and 4-206.  *Hicks*, 2026 WL 1601794,
at *45 (Leahy, J., concurring).  The first provision, § 36B of Article 27, governed the wear, carry,
and transport of handguns, and is "the predecessor statute" to C.L. § 4-203.  *Lawrence*, 475 Md.
at 401, 257 A.3d at 598.[12]  The second provision, § 36D, "established a procedure for officers" to

---

[10] In the Joint Concurrence in *Hicks*, Judges Berger, Friedman, and Shaw explain that Maryland actually enacted a "broad concealed-carry restriction in 1870," and "extended it statewide in 1886." *Hicks*, 2026 WL 1601794, at 34 n.16 (citation omitted).  Moreover, they note that "Maryland's four state constitutions have never recognized an individual right to keep and bear arms — a conscious choice, not an oversight." *Id.*  They add that at the State constitutional convention of 1867, "held contemporaneously with ratification of the Fourteenth Amendment," the delegates rejected a proposal to add such a right to the State's constitution. *Id.*

[11] Judge Leahy states in her concurrence in *Hicks* that the 1972 legislation was enacted in response to the Supreme Court's 1968 decision in *Terry v. Ohio*, 392 U.S. 1 (1968). *See Hicks*, 2026 WL 1601794, at *45 (Leahy, J., concurring).

[12] In 2002, the Maryland General Assembly recodified Article 27 into a new article in the Maryland Code, titled the Criminal Law Article. *See* Acts of 2002, ch. 26, at 197.  The revision of the State criminal code was regarded as non-substantive. *See Hicks*, 2026 WL 1601794, at *46 n.4 (Leahy, J. concurring).

follow to determine whether a person was in violation of Section 36B. *Hicks*, 2026 WL 1601794, at *46 (Leahy, J., concurring). It became C.L. § 4-206. *Id.*

The Maryland Court of Appeals[13] has recognized "the direct lineage" between Article 27, § 36B(b) and C.L. § 4-203. *See Lawrence*, 475 Md. at 404, 257 A.3d at 600. For convenience, I shall sometimes refer to C.L. § 4-203 and related statutory provisions collectively as Maryland's "wear, carry" law or "wear and carry" law.

In addition, the Maryland General Assembly enacted the Responsible Gun Safety Act of 2000; the Firearm Safety Act of 2013 ("FSA"); and the Gun Safety Act of 2023 (the "Act"). And, on May 26, 2026, Governor Wes Moore signed into law SB 334, effective January 1, 2027, which bans the sale, purchase, transfer, or receipt of machine gun convertible pistols. *See* C.L. § 4-305.2.[14]

The 2023 Act, which went into effect on October 1, 2023, is rooted in the 2013 FSA, which went into effect on October 1, 2013. The FSA was enacted by the Maryland General Assembly in the aftermath of several mass shootings in the country, including the 2012 tragedy in Newtown, Connecticut, when 20 first-graders and six adults were brutally murdered by a 20-year-old individual who killed the victims with an AR-15-type Bushmaster rifle. *See Maryland Shall Issue,*

---

[13] In the Maryland general election held in November 2022, the voters of Maryland approved a constitutional amendment to change the name of the Maryland Court of Appeals to the Supreme Court of Maryland. And, the voters also approved a change in the name of the State's intermediate appellate court, from the Maryland Court of Special Appeals to the Appellate Court of Maryland. These changes went into effect on December 14, 2022. *See* Press Release, Maryland Courts, *Voter-approved constitutional change renames high courts to Supreme and Appellate Court of Maryland* (Dec. 14, 2022), https://perma.cc/TL89-QFKR. But, I shall refer to the courts by the names that were in effect when the cited decisions were issued.

[14] The National Rifle Association of America and others recently filed a Second Amendment challenge to the statute. *See National Rifle Assoc. of Am. v. Moore*, JRR-26-02074 (District of Maryland).

*Inc. v. Moore*, 116 F.4th 211, 216 (4th Cir. 2024) (en banc), *cert. denied*, 145 S. Ct. 1049 (2025); *Bianchi v. Brown*, 111 F.4th 438, 441 (4th Cir. 2024) (en banc), *cert. denied sub nom. Snope v. Brown*, 605 U.S. ___, 145 S. Ct. 1534 (Mem) (2025); *Kolbe v. Hogan*, 849 F.3d 114, 120 (4th Cir. 2017) (en banc), *cert. denied*, 585 U.S. 1007 (Mem) (2017).

Almost a decade after the FSA went into effect, the Supreme Court decided *Bruen*, 597 U.S. 1.  In *Bruen*, the Supreme Court held that the Second Amendment "protect[s] an individual's right to carry a handgun for self-defense outside the home."  *Id.* at 10; *see id.* at 9-11, 32-33. Therefore, the Court determined that New York's "proper cause" requirement for a public handgun carry license was unconstitutional.  *Id.* at 38.  As the government puts it, the Supreme Court's decision in *Bruen* now "makes all states 'shall issue' licensing schemes . . . because law abiding individuals have a presumptive right to carry a firearm in public . . . ."  ECF 34 at 21.

At the time that *Bruen* was decided, Maryland had a "may issue" permitting scheme, in contrast to a "shall issue" permitting regime.  *See* ECF 34 at 21; *Hicks*, 2026 WL 1601794, at *6. Under Maryland's may issue licensing scheme, as set forth in the FSA, an applicant for a permit to carry a handgun had to show a "good and substantial reason . . ." to obtain a permit to do so. *See In re Rounds*, 255 Md. App. 205, 210, 279 A.3d 1048, 1051 (2022) (quoting former P.S. § 5-306(a)(6)(ii)).  But, "[t]he reach of [*Bruen's*] holding was immediate and significant — Maryland's own permit statute, which imposed a similar showing-of-need requirement [to obtain a permit to carry], fell along with New York's as a direct consequence."  *Hicks*, Joint Concurrence, 2026 WL 1601794, at *28 (alterations added).  Indeed, in *Rounds*, 255 Md. App. at 212, 279 A.3d at 1052, the Maryland Court of Special Appeals found former P.S. § 5-306(a)(6)(ii) unconstitutional.  *See Hicks*, 2026 WL 1601794, at *7.

To conform with *Bruen*, and to cure any constitutional flaws in the FSA, the Maryland

General Assembly amended the FSA in 2023 by way of the Gun Safety Act of 2023. Among other revisions, the Maryland legislature "replaced the permit statute with one that did not demand the applicant's assertion of a special need[]" to obtain a permit. *Hicks*, Joint Concurrence, 2026 WL 1601794, at \*28 (citing 2023 Md. Laws Ch. 651). Nevertheless, much of the FSA was left intact. The Act was the operative statute in February 2025, when the underlying incident involving Fallin occurred.

Pertinent here, the Act amended P.S. § 5-306, titled "Qualifications for permit," to remove the "good and substantial reason" requirement from the permitting scheme, thereby rendering Maryland a "shall issue" state. *See Hicks*, 2026 WL 1601794, at \*7. In particular, by statute, Maryland's "citizens are authorized to obtain *a concealed carry permit* provided that they are 21 years of age or a member of the uniformed services, do not have any disqualifying offenses or mental disorders, do not have a substance abuse disorder, have successfully completed a firearms training course, and 'based on an investigation . . . ha[ve] not exhibited a propensity for violence or instability that may reasonably render the person's possession of a handgun a danger to the person or to another.'" *Id.* (citing P.S. § 5-306(a)) (alterations in *Hicks*; emphasis added). In addition, an applicant for a permit cannot otherwise be prohibited by federal or State law from possessing a handgun. *Hicks*, 2026 WL 1601794, at \*7 (citing P.S. § 5-306(a)(10)(ii)).[15]

In addition, the Act added a new provision to Title 4 of the Criminal Law Article, is codified at C.L. § 4-111. It is titled "Possession of a firearm." In C.L. §§ 4-111(c) – (e), the Act prohibits the wear, carry, or transport of a firearm in particular, sensitive locations, subject to

---

[15] The Fourth Circuit has described Maryland's gun licensing law as a "shall-issue" law and upheld its constitutionality under the Second Amendment in *Maryland Shall Issue, Inc.*, 116 F.4th 211. There, the Court's majority said that Maryland's "type of licensing law is presumptively constitutional because it operates merely to ensure that individuals seeking to exercise their Second Amendment rights are 'law-abiding' persons." *Id.* at 216.

exceptions in § 4-111(b).  For example, § 4-111(c) provides that a person may not wear, carry, or transport a firearm "in an area for children or vulnerable individuals."  Section 4-111(a)(2) defines "Area for children and vulnerable individuals."  C.L. § 4-111(d) prohibits wear and carry in government buildings, as defined in § 4-111(a)(4).

In *Kipke v. Moore*, 165 F.4th 194 (4th Cir. 2026), the Fourth Circuit considered a Second Amendment challenge to Maryland's ban on handguns in sensitive places, such as schools, government buildings, and on public transportation, as set forth in C.L. § 4-111, as well as Md. Code, § 7-705(b)(6) of the Transportation Article, and certain provisions of the Code of Maryland Regulations ("COMAR").[16]  With an exception that is not pertinent here, the Fourth Circuit upheld the constitutionality of the Maryland law.[17]

Also of relevance, C.L. § 4-111(b) sets forth persons for whom and locations for which the "section does not apply . . . ."  These include law enforcement officers, service members on duty or traveling to or from duty, and others.  Pertinent here, C.L. § 4-111(b)(11)(ii) indicates that the "section does not apply" to "a handgun worn, carried, or transported in compliance with any limitations imposed under § 5-307 of the Public Safety Article, by a person to whom a permit to wear, carry, or transport the handgun has been issued under Title 5, Subtitle 3 of the Public Safety Article." C.L. § 4-203, which governs wear and carry, contains similar language in § 4-203(b)(2), discussed shortly.

---

[16] Although *Kipke* was decided in January 2026, well before the motions were fully briefed, neither side cites *Kipke*.

[17] In Justice Kavanaugh's concurrence in *Bruen*, 597 U.S. at 81, he said: "'[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings . . . .'" (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)) (alteration in *Bruen*); *see also United States v. Rahimi*, 602 U.S. 680 (2024); *United States v. Holman*, 171 F.4th 303 (4th Cir. 2026).

Under C.L. § 4-111(f), a person who willfully violates subsection (c), (d)(1), or (e) is guilty of a misdemeanor.  If convicted, the individual is subject to a term of imprisonment not exceeding one year and a fine of up to $1,000.  And, under § 4-111(g)(1), "[a] conviction under this section may not merge with a conviction for any other crime based on the act establishing the violation of this section."  Moreover, C.L. § 4-111(g)(2) provides that a sentence imposed under this section may run consecutive to a sentence for any crime based on the act.

C.L. § 4-111(h)(1) is also noteworthy.  It provides that "a requirement to keep a handgun concealed is not violated by:  the momentary and inadvertent exposure of a handgun[.]"

As noted, Subtitle 2 of Title 4 is titled "Handguns."  C.L. § 4-203 is titled "Wearing, carrying, or transporting handgun," and it provides, in part (italics added):

> (a)(1) Except as provided in subsection (b) of this section, *a person may not*:
>      (i) *wear, carry, or transport a handgun, whether concealed or open, on or about the person*;
>      (ii) *wear, carry, or knowingly transport a handgun, whether concealed or open, in a vehicle traveling on a road* or parking lot generally used by the public, highway, waterway, or airway of the State;
>      (iii) violate item (i) or (ii) of this paragraph while on public school property in the State;
>      (iv) violate item (i) or (ii) of this paragraph with the deliberate purpose of injuring or killing another person; or
>      (v) violate item (i) or (ii) of this paragraph with a handgun loaded with ammunition.
>    (2)  There is a rebuttable presumption that a person who transports a handgun under paragraph (1)(ii) of this subsection transports the handgun knowingly.

However, pursuant to C.L. § 4-203(b), handgun possession is not prohibited under all circumstances.  C.L. § 4-203(b) states (italics added):

> (b)  This section does not prohibit:

> \*    \*    \*

> (2) *the wearing, carrying, or transporting of a handgun by a person to whom a permit to wear, carry, or transport the handgun has been issued under Title 5, Subtitle 3 of the Public Safety Article.*

(3) the carrying of a handgun on the person or in a vehicle while the person is transporting the handgun to or from the place of legal purchase or sale, or to or from a bona fide repair shop, or between bona fide residences of the person, or between the bona fide residence and place of business of the person, if the business is operated and owned substantially by the person if each handgun is unloaded and carried in an enclosed case or an enclosed holster;

\* \* \*

Penalty provisions are found in C.L. § 4-203(c).  In C.L. § 4-203(c)(1), it states: "A person who violates this section is guilty of a misdemeanor and on conviction is subject to the penalties provided in this subsection."  The text of the subsection is dense; it consumes a page and a half of single-spaced text in the Code.  Under some circumstances, it sets out mandatory minimum sentences and ten-year maximum sentences.  *See*, *e.g.*, C.L. § 4-203(c)(4)(i).

As discussed in more detail, *infra*, defendant relies on the legislative change in 2023 to the text of C.L. § 4-203(b)(2) to support his claim that, at the relevant time, defendant was entitled to display the handgun if he had a permit to carry it.  And, because the BPD had no ground to believe that defendant lacked a permit, defendant insists that the stop and the ensuing vehicle search were unlawful.

Defendant's contention requires the Court to consider the language of C.L. § 4-203(b)(2) prior to the amendment that went into effect on October 1, 2023.  Before October 1, 2023, C.L. § 4-203(b)(2) provided, in part, ECF 37-2 at 2 (boldface added):

(b) *Exceptions.* — This section does not prohibit:

\* \* \*

(2) the wearing, carrying, or transporting of a handgun, **in compliance with any limitations imposed under § 5-307 of the Public Safety Article,** by a person to whom a permit to wear, carry, or transport the handgun has been issued under Title 5, Subtitle 3 of the Public Safety Article;

Maryland's statutory scheme also includes provisions that are pertinent in circumstances when a police officer believes that an individual may be violating C.L. § 4-203. C.L. § 4-206, titled "Limited Search, seizure, and arrest," authorizes a law enforcement officer to investigate a reasonable belief of a statutory violation, under certain circumstances. It states, in part (italics added to text):

> (a) *Limited Search.*—(1) *A law enforcement officer may make an inquiry and conduct a limited search of a person under paragraph 2) of this subsection if the officer, in light of the officer's observations, information, and experience, reasonably believes that*:
>    (i) *the person may be wearing, carrying, or transporting a handgun in violation of § 4-203 of this subtitle*;
>    (ii) *Because the person possesses a handgun, the person is or presently may be dangerous to the officer or to others*;
>    (iii) under the circumstances, it is impracticable to obtain a search warrant; and
>    (iv) to protect the officer or others, swift measures are necessary to discover whether the person is wearing, carrying, or transporting a handgun.
>
> (2) If the circumstances specified under paragraph (1) of this subsection exist, a law enforcement officer:
>    (i) may approach the person and announce the officer's status as a law enforcement officer;
>    (ii) may request the name and address of the person;
>    (iii) if the person is in a vehicle, may request the person's license to operate the vehicle and the registration of the vehicle;
>    (iv) *may ask any question and request any explanation that may be reasonably calculated to determine whether the person is unlawfully wearing, carrying, or transporting a handgun in violation of § 4-203 of this subtitle*; and
>    (v) if the person does not offer an explanation that dispels the officer's reasonable beliefs described in paragraph (1) of this subsection, *may conduct a search of the person limited to a patting or frisking of the person's clothing in search of a handgun.*
>
> (3) *A law enforcement officer acting under this subsection shall take into account all circumstances of the occasion*, including the age, appearance, physical condition, manner, and gender of the person approached.
>    (b) *Seizure of handgun and arrest.*—(1) *If the officer discovers that the person is wearing, carrying, or transporting a handgun, the officer may demand evidence from the person of the person's authority to wear, carry, or transport the handgun in accordance with § 4-203(b) of this subtitle.*
> (2) *If the person does not produce the evidence specified in paragraph (1) of this subsection, the officer may seize the handgun and arrest the person.*

\*     \*     \*

(e) *Construction of section.* — (1) This section may not be construed to limit the right of a law enforcement officer to conduct any other type of search or seizure or make an arrest that is otherwise authorized by law.

(2) The provisions of this section are in addition to and not limited by the provisions of Title 2 of the Criminal Procedure Article. (An. Code 1957, art. 27, § 36D; 2002, ch. 26, § 2; 2010, ch. 72 § 5; 2011, ch. 65, § 5.

As indicated, the statutory scheme is also found in provisions set forth in the Public Safety Article.  Title 5 is titled "Firearms" and Subtitle 3 is titled "Handgun Permits."

P.S. § 5-303, titled "Permit required," provides (italics added):  "A person *shall* have a permit issued under this subtitle before the person carries, wears, or transports a handgun."  And, under P.S. § 5-304, an individual applies to the State Police for a gun permit.

P.S. § 5-306 concerns "Qualifications for permit."  Substantial revisions were made to § 5-306 in 2023, in response to *Bruen*.  As discussed, prior to *Bruen*, an applicant for a gun carry permit in Maryland had to establish a "good and substantial reason" to obtain the permit.  *See* FSA, 2013 Md. Laws ch. 427; P.S. § 5-306(a)(6)(ii) (repealed).  The amendment removed that requirement from P.S. § 5-306.  But, other requirements remain.

Under the prior version of P.S. § 5-307, titled "Scope of permit," the Secretary of the Maryland State Police was allowed to impose limitations as to time and place with regard to a gun permit.  But, P.S. § 5-307 was also substantially revised by the Act.  It states, in part (italics added):

**§ 5-307.  Scope of permit.**

\*     \*     \*

(b)(1) Subject to subsection (c) of this section, *a permit* issued under this subtitle *shall restrict* the wearing, carrying, and transporting of a handgun by the person to whom the permit is issued *to wearing, carrying, or transporting a handgun concealed from view*:
     (i) under or within an article of the person's clothing; or
     (ii) within an enclosed case.
  (2) The requirement in paragraph (1) of this subsection to keep a handgun concealed is not violated by:

24

(i) the momentary and inadvertent exposure of a handgun; or

(ii) the momentary and inadvertent exposure of the imprint or outline of a handgun.[18]

P.S. § 5-308, titled "Possession of permit required," provides:  "A person to whom a permit is issued . . . shall carry the permit in the person's possession whenever the person carries, wears, or transports a handgun."

## III. Evidence Motion

It is undisputed that on February 4, 2025, Detective Mendez personally observed the defendant withdraw a handgun from his waistband while defendant was standing on a public street in Baltimore City.  Defendant's conduct is captured on a CitiWatch camera.  Mendez communicated that information to members of the DAT, who promptly responded to the location where defendant had been seen with the gun.  With this background, I shall review the parties' contentions.

### A.  Contentions

The government contends (ECF 34 at 19) that the seizure of the defendant constituted a lawful, investigatory stop under *Terry v. Ohio*, 392 U.S. 1 (1968); *see also United States v. Arvizu*, 534 U.S. 266, 277-78 (2002); *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *United States v. Sokolow*, 490 U.S. 1, 7 (1989).  Moreover, the government asserts that police officers conducting a *Terry* stop may "'take such steps as [are] reasonably necessary to protect their personal safety . . . during the course of the stop.'"  ECF 34 at 14 (*citing United States v. Hensley*, 469 U.S. 221, 235 (1985)) (alteration in ECF 34).  Indeed, the government maintains that the focus on officer

---

[18] The text in P.S. § 5-307(b)(2) is also found in C.L. § 4-111(h).  The parties do not address the statutory duplication.

safety is necessarily "heightened" during traffic stops.  ECF 34 at 14 (citing *United States v. Stansfield*, 109 F. 3d 976, 978 (4th Cir. 1997)).

In addition, the government maintains that, "where a suspect is an occupant . . . of a vehicle at the initiation of a *Terry* stop, and where the police reasonably believe the suspect may be dangerous and that there may be readily-accessible weapons in his vehicle, the case of *Michigan v. Long*, 463 U.S. 1032 (1983), authorizes a protective search of the vehicle for weapons, provided police harbor a reasonable belief that the suspect may gain access to the vehicle at a time when that access would endanger the safety of the officers conducting the stop or of others nearby— including the reasonable belief that the suspect will return to the vehicle following the conclusion of the *Terry* stop."  ECF 34 at 14-15 (quoting *United States v. Holmes*, 376 F.3d 270, 280-81 (4th Cir. 2004)).

The government bases its arguments on the fact that defendant withdrew a handgun from his waistband while on a public street, thereby openly displaying it.  The government contends that, even if defendant had a permit to carry a gun, his conduct was illegal in Maryland because, under Maryland law, a permit only authorizes an individual to publicly carry a *concealed* weapon but not to *openly* carry such a weapon.  ECF 34 at 20-23, 27.  Therefore, the government maintains that Fallin's conduct was illegal, whether or not he had a permit, and therefore the *Terry* stop was lawful.

Defendant counters that Maryland law permits an individual to openly carry a handgun, "as long as the possessor has a permit."  ECF 33 at 6; *see id.* at 8.  He argues, ECF 37 at 11: "Contrary to the government's claim, it is simply not a crime in Maryland for permit holders to carry handguns openly."  And, defendant insists that the police lacked any basis to believe that defendant "lacked a permit."  ECF 33 at 2; *see id.* at 6.  Fallin asserts, *id.* at 8: "Officers who see

someone with a handgun cannot justify a stop simply by assuming, without evidence, that he lacks a permit." *See id.* at 11-13.

Fallin also points out that neither Mendez nor Klein testified to any facts suggesting that defendant lacked a permit at the relevant time. ECF 54 at 10. And, Fallin reiterates that the police officers were not entitled to assume that he lacked a permit. *Id.* Therefore, Fallin contends that the seizure of the defendant and the ensuing search of his car were unlawful under *Terry v. Ohio*, 392 U.S. 1, in violation of the Fourth Amendment. *Id.* at 2.

In addition, Fallin relies on the constitutional right to keep and bear arms, enshrined in the Second Amendment. ECF 33 at 18.[19] Given the "constitutionally protected status" of handgun possession, which defendant argues is "a quintessential exercise of a 'fundamental' constitutional right," Fallin maintains that carrying a handgun publicly, with a permit, is "'innocent' conduct like any other." *Id.* at 21.

Fallin looks primarily to the statutory scheme to support his position that his conduct in openly carrying a handgun was lawful. He maintains that Maryland's prohibitions as to wear, carry in C.L. § 4-203(a)(1)(i) and (b)(2) do not apply to "a person to whom a permit . . . has been issued." ECF 33 at 1. He states, ECF 37 at 11: "If someone has a permit, he can carry a handgun, 'whether concealed or open,' without engaging in criminal conduct. CL § 4-203(a)(1)(i), (b)(2)." According to Fallin, in order for the police lawfully "[t]o stop someone for a suspected violation of [C.L.] § 4-203(a)(1)(i) . . . police must have reasonable suspicion not only that he is carrying a handgun, but also that he does not have a handgun permit." ECF 33 at 2; *see also id.* at 6.

---

[19] Defendant does not contend that Maryland's statutory scheme violates the Second Amendment.

Therefore, Fallin argues that the open carry of a handgun did not give rise to reasonable suspicion of criminal activity. *Id.*

The lynchpin of defendant's contention that the *Terry* stop was illegal depends on his view that Maryland's handgun statutory scheme allows open carry, so long as the individual has a valid permit. Conversely, defendant's position collapses if Maryland prohibits open carry, even with a permit.

Turning to the statutory text, defendant notes that under C.L. § 4-203(a)(1)(i), "a person may not . . . wear, carry, or transport a handgun, whether concealed or open . . . .", "[e]xcept as provided in subsection (b). . . ." ECF 33 at 8; *see also* ECF 37 at 2; ECF 54 at 5. And, he points out that C.L. § 4-203(b)(2) "does not prohibit the wearing, carrying, or transporting of a handgun by a person to whom a permit has been issued under Title 5, Subtitle 3 of the Public Safety Article." ECF 33 at 8; *see* ECF 37 at 2. Therefore, he reasons: "Putting these two provisions together," C.L. § 4-203(a)(1)(i) "does not prohibit anyone from wearing, carrying, or transporting a handgun on his person, 'whether concealed or open,' as long as he has a permit." ECF 33 at 8. In Fallin's view, C.L. § 4-203(b)(2) and P.S. § 5-307 "cannot be read to make open carry a crime for permit holders." ECF 54 at 5; *see* ECF 37 at 2-11.

Defendant acknowledges that P.S. § 5-307(b)(1) "restrict[s] the wearing, carrying, and transporting of a handgun . . . to wearing, carrying, or transporting a handgun *concealed* from view." ECF 37 at 2 (emphasis added). But, he observes that neither C.L. § 4-203(a)(1)(i) nor P.S. § 5-307(b)(1) "imposes criminal liability on permit holders who carry handguns openly." *Id.* He argues, *id.* at 9-10: P.S. § 5-307(b)(1) "bears none of the hallmarks of a criminal prohibition" because if it "established a crime" it would say so. Moreover, defendant observes that "the government does not point to any language in C.L. § 4-203 that even arguably criminalizes

carrying a handgun in a manner that 'exceed[s]' the terms of a permit."  ECF 54 at 6 (alteration in ECF 54).

In advancing the position that Maryland law allows open carry, with a permit, defendant relies on the amendment to C.L. § 4-203, effective October 2023, with the passage of the Gun Safety Act of 2023.  *See* ECF 37-1 at 6.  He posits that "C.L. § 4-203 *used* to contain" language that criminalized the carrying of handguns "in a manner unauthorized by the possessor's permit." ECF 54 at 6, 7 (emphasis in ECF 54).  But, Fallin maintains that "the legislature repealed it in 2023 . . . ."  *Id.* at 6. Therefore, argues defendant, the Act "makes clear that carrying a handgun in a manner that violates a permit's terms does not constitute a crime."  *Id.* at 7.

To facilitate an understanding of the defense's statutory argument, I pause to review again both the current and prior versions of C.L. § 4-203(b)(2).

As amended in 2023, C.L. § 4-203(b)(2) currently provides:

(b) This section does not prohibit:

\*    \*    \*

   (2) the wearing, carrying, or transporting of a handgun, by a person to whom a permit to wear, carry, or transport the handgun has been issued under Subtitle 5, Subtitle 3 of the Public Safety Article;

Prior to the amendment in 2023, C.L. § 4-203(b)(2) stated (boldface added):

(b)  *Exceptions.* — This section does not prohibit:

\*    \*    \*

   (2) the wearing, carrying, or transporting of a handgun, **in compliance with any limitations imposed under § 5-307 of the Public Safety Article,** by a person to whom a permit to wear, carry, or transport the handgun has been issued under Title 5, Subtitle 3 of the Public Safety Article;

The textual comparison shows that in 2023, the Maryland General Assembly deleted the words referenced above in boldface, *i.e.*, "in compliance with any limitations imposed under § 5-

307 of the Public Safety Article." In defendant's supplemental submission (ECF 58), he also points out that the "in compliance with" text that was removed from C.L. § 4-203(b)(2) in 2023 is "identical" to text that was added in C.L. § 4-111(b)(11)(ii). *Id.* at 5. He insists that the "well-established canons of statutory construction" compel the conclusion that the 2023 Act entirely altered the statutory prohibitions with regard to wear, carry law. *Id.* at 2.

As noted, C.L. § 4-111 was added to the statutory scheme in 2023, and establishes restrictions regarding firearms in certain sensitive locations. But, under § 4-111(b)(11)(ii), the prohibitions do not apply when "a handgun [is] worn, carried, or transported in compliance with any limitations imposed under § 5-307 of the Public Safety Article, by a person to whom a permit to wear, carry, or transport the handgun has been issued under Title 5, Subtitle 3 of the Public Safety Article."

Defendant maintains that the deletion of the words referenced above, and their inclusion elsewhere, compels the conclusion that an individual may now openly carry a handgun. ECF 58 at 2. According to Fallin, the Maryland legislature "intended" the two provisions "to have different meanings." *Id.* at 5 (citing, *e.g.*, *Lawrence*, 475 Md. at 407, 257 A.3d at 601). And, he argues that this Court may not add the "'in compliance with' language back into C.L. § 4-203(b)(2)," because "Maryland courts recognize that when the legislature removes words from a statute, the deletion is meant to change the statute's meaning. A court cannot 'implicitly read[] those [words] back into the statute' . . . ." *Id.* at 4 (citation omitted; alterations in ECF 58).

Simply put, defendant contends that a court may not construe a revised statute to have the same meaning that it had before the statute was revised, regardless of the revision. *Id.* at 2. He posits: "When a court gives a statute the same meaning it had before the legislature amended it,

the court, 'in effect, repeal[s]' the amending legislation—something courts may not do. *Id.* (citation omitted; alteration in ECF 58).

In sum, defendant reiterates, ECF 37 at 2-3 (italics in ECF 37):

Under a straightforward, plain-text reading of CL § 4-203, public carry of a handgun, either "*concealed or open*," is legal as long as the carrier has a permit. There is no language in CL § 4-203 that even arguably forbids permit holders to carry openly; the only ban on open carry appears in CL § 4-203(a)(1)(i), but that subsection "does not prohibit" public carry by someone to whom a permit has been issued. CL § 4-203(b)(2). Because the language of CL § 4-203 is "clear and unambiguous," this Court must "give effect to the statute as it is written." *Peterson v. State*, 226 A.3d 246, 254 (Md. 2020).

Fallin adds, *id.* at 3 (alterations in ECF 37):

The Maryland legislature could have included the word "concealed" in CL § 4-203(b)(2), but it chose not to. And "[a] court may neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of [a] statute; nor may it construe the statute with forced or subtle interpretations that limit or extend its application." *Price v. State*, 835 A.2d 1221, 1226 (Md. 2003).

## B. Principles of Statutory Construction

As just discussed, Fallin relies on recent legislative changes to Maryland's handgun laws, as well as principles of statutory construction, to argue that Maryland law permits an individual, with a permit, to wear and carry a handgun openly, in public. And, claiming that the BPD had no basis to suspect that defendant lacked a permit, he insists that both the stop and the vehicle search were illegal under *Terry* and the Fourth Amendment. Defendant's argument that Maryland allows open carry, with a permit, depends upon the construction of the statute. This, in turn, implicates principles of statutory construction with regard to two articles of the Maryland Code: the Criminal Law Article and the Public Safety Article.

C.L. § 4-203, which pertains to wearing, carrying, or transporting a handgun, expressly incorporates in its text Title 5, Subtitle 3 of the Public Safety Article. *See* C.L. § 4-203(b)(2) (stating that a person to whom a handgun permit has been issued under Title 5, Subtitle 3 of the

Public Safety Article is not prohibited from wearing, carrying, or transporting a handgun); *Cf. Adamson v. Corr. Med. Servs., Inc.*, 359 Md. 238, 252, 753 A.2d 501, 508 (2000) ("Our statutory construction analysis, therefore, requires an extensive restatement and integration of various sections of the [Maryland Prison Litigation Act in the Courts Article] . . . and [the] Correctional Services Article . . . . Only after the statutory mosaic is pieced together, and placed in its proper context, can we gather a true picture of the scope of the [M]PLA's exhaustion requirement as it may apply to the case *sub judice*."). The provisions in the two articles of the Maryland Code must be harmonized.

The Fourth Circuit has instructed that, when interpreting a State statute, the federal court must "stand in the shoes of Maryland's courts" and "'look to the rules of construction applied by [Maryland's] highest court.'" *United States v. Lierman*, 151 F.4th 530, 536 (4th Cir. 2025) (quoting *Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am.*, 492 F.3d 484, 489 (4th Cir. 2007)); *see In re DNA Ex Post Facto Issues*, 561 F.3d 294, 300 (4th Cir. 2009). Notably, Maryland "follows the general principles of statutory interpretation." *Johnson v. Mayor & City Council of Balt.*, 430 Md. 368, 377, 61 A.3d 33, 38 (2013). Therefore, I shall reference both federal and Maryland cases with regard to the well honed principles of statutory construction.

Generally, the task of interpreting a statute begins with the statutory text. *Murphy v. Smith*, 583 U.S. 220, 223 (2018) ("As always, we start with the specific statutory language in dispute."); *see Groff v. Dejoy*, 600 U.S. 447, 468 (2023) (stating that "statutory interpretation must 'begi[n] with,' and ultimately heed, what a statute actually says") (citation omitted) (alteration in *Groff*); *Pharmaceutical Coalition for Patient Access v. United States*, 126 F. 4th 947, 953 (4th Cir. 2025) ("Statutory interpretation begins with the text of the statute."); *Williams v. Carvajal*, 63 F.4th 279, 285 (4th Cir. 2023) ("As always, an issue of statutory interpretation begins with the

text."); *Redeemed Christian Church of God (Victory Temple) Bowie, Md. v. Prince George's Cty., Md.*, 17 F.4th 497, 508 (4th Cir. 2021) ("When faced with a statutory provision, 'the starting point for any issue of statutory interpretation . . . is the language of the statute itself.'") (quoting *D.B. v. Cardall*, 826 F.3d 721, 734 (4th Cir. 2016)) (alteration in original); *Navy Fed. Credit Union v. LTD Fin. Servs., LP*, 972 F.3d 344, 356 (4th Cir. 2020) ("'As in all statutory construction cases,' we start with the plain text of the provision.") (quoting *Marx v. General Revenue Corp.*, 568 U.S. 371, 376 (2013)); accord *McAdams v. Robinson*, 26 F.4th 149, 156 (4th Cir. 2022); *United States v. Bryant*, 949 F.3d 168, 174–75 (4th Cir. 2020); *Othi v. Holder*, 734 F.3d 259, 265 (4th Cir. 2013); *Ignacio v. United States*, 674 F.3d 252, 254 (4th Cir. 2012).

A statute "means what it says." *Simmons v. Himmelreich*, 578 U.S. 621 (2016); *see United States v. Cohen*, 63 F.4th 250, 253 (4th Cir. 2023). When the statutory text is clear, the "judicial inquiry is complete." *Crespo v. Holder*, 631 F.3d 130, 136 (4th Cir. 2011). "'[A]bsent ambiguity or a clearly expressed legislative intent to the contrary,'" courts apply the "plain meaning" of the statute. *United States v. Abdelshafi*, 592 F.3d 602, 607 (4th Cir. 2010) (quoting *United States v. Bell*, 5 F.3d 64, 68 (4th Cir. 1993)); *see United States v. George*, 946 F.3d 643, 645 (4th Cir. 2020) ("When interpreting a statute, courts must 'first and foremost strive to implement congressional intent by examining the plain language of the statute.'") (quoting *Abdelshafi*, 592 F.3d at 607).

A court determines a statute's plain meaning by referencing the "ordinary meaning [of the words] at the time of the statute's enactment." *United States v. Simmons*, 247 F.3d 118, 122 (4th Cir. 2001); *see also Holly Frontier Cheyenne Refining, LLC v. Renewable Fuels Ass'n*, 594 U.S. 382, 388 (2021); *Wisconsin Cent. Ltd v. United States*, 585 U.S. 274, 277 (2018). Undefined terms of a statute are "'interpreted as taking their ordinary, contemporary, common meaning.'" *Sandifer*

33

*v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (citation omitted); *see Tankersley v. Almand*, 837 F.3d 390, 395 (4th Cir. 2016) ("Where Congress has not defined a term, we are "bound to give the word its ordinary meaning unless the context suggests otherwise.") (citation omitted); *accord George*, 946 F.3d at 645; *Blakely v. Wards*, 738 F.3d 607, 611 (4th Cir. 2013). Moreover, "'the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (citation omitted); *see United States v. Hansen*, 599 U.S. 762, 775 (2023) ("When words have several plausible definitions, context differentiates among them."); *see also Gundy v. United States*, 588 U.S. 128, 141 (2019); *King v. Burwell*, 576 U.S. 473, 486 (2015); *Nat'l Ass'n. of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007); *Pharmaceutical Coalition for Patient Access*, 126 F. 4th at 953.

In general, a court may "not resort to legislative history to cloud a statutory text that is clear." *Ratzlaf v. United States*, 510 U.S. 135, 147–48 (1994); *see Raplee v. United States*, 842 F.3d 328, 332 (4th Cir. 2016) ("If the meaning of the text is plain . . . that meaning controls."). Nevertheless, "the text and structure" of the statute is not analyzed in "a vacuum. . . . Rather, [a court] must interpret the statute with reference to its history and purpose as well." *Bryant*, 949 F.3d at 174–75 (citing *Abramski v. United States*, 573 U.S. 169, 179 (2014) and *Gundy*, 588 U.S. at 141)).

Similarly, in Maryland, a legion of cases makes clear that the "'cardinal rule of statutory construction is to ascertain and effectuate the General Assembly's intent.'" *Conaway v. State*, 464 Md. 505, 522, 212 A.3d 348, 358 (2019) (citation omitted); *see Price*, 378 Md. at 387, 835 A.2d at 1226 ("The chief goal of statutory interpretation is to discover the actual intent of the legislature in enacting the statute . . . ."); *Williams v. Peninsula Reg'l Med. Ctr.*, 440 Md. 573, 580, 103 A.3d 658, 663 (2014) ("'The cardinal rule of statutory interpretation is to ascertain and effectuate the

intent of the Legislature.'") (citation omitted); *Blue v. Prince George's County*, 434 Md. 681, 689, 76 A.3d 1129, 1133 (2013) ("The goal of statutory construction is to discern and carry out the intent of the Legislature"); *Lockshin v. Semsker*, 412 Md. 257, 274, 987 A.2d 18, 28 (2010) ("The cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the Legislature."); *see also Blackstone v. Sharma*, 461 Md. 87, 113, 191 A.3d 1188, 1203 (2018); *Deville v. State*, 383 Md. 217, 223, 858 A.2d 484, 487 (2004).

To that end, the Maryland Supreme Court follows a two-step approach. *See Johnson*, 430 Md. at 377-78, 61 A.3d at 38. Courts first examine "'the plain meaning of the statutory language[.]'" *Id*. at 377, 61 A.3d at 38 (citation omitted). If the language "'is clear and unambiguous, and consistent with both the broad purposes of the legislation, and the specific purpose of the provision being interpreted, [the] inquiry is at an end.'" *Id.* (citation omitted); *see Breslin v. Powell*, 421 Md. 266, 286-87, 26 A.3d 878, 891 (2011) (stating that if the text is "clear and unambiguous, courts will give effect to the plain meaning of the statute and no further sleuthing of statutory interpretation is needed). However, if the statutory language is unclear or ambiguous, the second step is implicated. *Johnson*, 430 Md. at 377, 61 A.3d at 38. When the statute's "'language is ambiguous or unclear, [courts] seek to discern the intent of the legislature from surrounding circumstances, such as legislative history, prior case law, and the purposes upon which the statutory framework was based.'" *Id.* (citation omitted, alteration added); *see Price*, 378 Md. at 388, 835 A.2d at 1226.

To "ascertain the intent of the General Assembly," courts "begin with the normal, plain meaning of the language of the statute." *Lockshin*, 412 Md. at 275, 987 A.2d at 28; *see Breslin*, 421 Md. at 286, 26 A.3d at 891 ("In attempting to discern the intent of the Legislature, courts 'look first to the plain language of the statute, giving it its natural and ordinary meaning.'") (citation

omitted).  The legislative intent "primarily reveals itself through the statute's very words."  *Price*, 378 Md. at 387, 835 A.2d at 1226.  If a statutory term is not defined, it is "'proper to consult a dictionary or dictionaries for a term's ordinary and popular meaning.'" *Montgomery County v. Deibler*, 423 Md. 54, 67, 31 A.3d 191, 198 (2011) (citation omitted).

As in federal courts, the Maryland courts "'do not read statutory language in a vacuum,'" nor do they "'confine [their] interpretation of a statute's plain language to the isolated section alone.'"  *Williams*, 440 Md. at 580-81, 103 A.3d at 663 (citation omitted); *see Gundy*, 588 U.S. at 129; *Williams v. Morgan State Univ.,* 484 Md. 534, 551, 300 A.3d 54, 64 (2023).  Rather, the plain language of a statute "'must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute.'" *In re J.C.N.*, 460 Md. 371, 391, 190 A.3d 329, 341 (2018) (citation omitted); *see In re St. Andrews United Methodist Church*, 2023 WL 386177, at *4 (Md. Ct. Spec. App. Jan. 25, 2023).

Notably, a Maryland court must strive to "avoid a construction of the statute that is unreasonable, illogical, or inconsistent with common sense." *Bellard v. State*, 452 Md. 467, 481-82, 157 A.3d 272, 280-81 (2017); *see Lawrence*, 475 Md. at 406-07, 257 A.3d at 601; *Breck v. Maryland State Police*, 452 Md. 229, 248, 156 A.3d 858, 869 (2017); *Polek v. J.P. Morgan Chase Bank, N.A.*, 424 Md. 333, 351, 36 A.3d 399, 409 (2012).  When one interpretation of statutory language would produce such a result, the court must reject that interpretation in favor of one that does not suffer the same flaw. *See Bell v. Chance*, 460 Md. 28, 53, 188 A.3d 930, 944 (2018).

Moreover, a statute must be read "'as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory.'" *Conaway*, 464 Md. at 523, 212 A.3d at 358; *see Lawrence*, 475 Md. at 404, 257 A.2d at 600; *Andrews & Lawrence Pro. Servs., LLC v. Mills*, 467 Md. 126, 149, 223 A.3d 947, 960 (2020); *Bourgeois v. Live Nation Ent's,*

*Inc.*, 430 Md. 14, 27, 59 A.3d 509, 516 (2013).  A court may "'neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute.'" *McCloud v. Dep't of State Police, Handgun Permit Review Bd.*, 426 Md. 473, 480, 44 A.3d 993, 997 (2012) (citation omitted).

Of course, "special considerations govern[] the interpretation of criminal statutes." *United States v. Hilton*, 701 F.3d 959, 966 (4th Cir. 2012).  Criminal statutes are "strictly construed and should not be interpreted to extend criminal liability beyond that which [the legislature] has plainly and unmistakenly proscribed." *Id.* (internal quotation marks and citation omitted).

The Supreme Court has acknowledged that "most statutes are ambiguous to some degree." *Muscarello v. United States*, 524 U.S. 125, 138 (1998); *see Reno v. Koray*, 515 U.S. 50, 65 (1995). Nevertheless, under the "rule of lenity," any ambiguity in a criminal statute "'must be resolved in favor of lenity for the accused.'" *George*, 946 F.3d at 645 (citations omitted).

As I proceed, I am mindful that the Fourth Circuit has admonished:  "In the end, 'no amount of policy-talk can overcome plain statutory text.'" *United States v. Taylor*, 62 F.4th 146, 151 (4th Cir. 2023) (quoting *Julmice v. Garland*, 29 F.4th 206, 210 (4th Cir. 2022)) (cleaned up).  In my view neither the "plain statutory text," the legislative history of the statutory scheme, nor the legislature's intent supports defendant's statutory construction.

### C.  Discussion

### 1.

With the principles of statutory construction in mind, I first address defendant's contention that Maryland law allows an individual, with a valid permit, to openly carry a handgun.  And, I also address defendant's claim that, in any event, an individual who openly carries a gun in Maryland does not commit a criminal offense.

C.L. § 4-203(a)(1)(i) states that, except as provided in § 4-203(b), "a person may not: (i) wear, carry, or transport a handgun, *whether concealed or open,* on or about the person[.]" (Emphasis added). Defendant insists that, under the exception in C.L. § 4-203(b)(2), so long as an individual has a valid permit, a firearm may be openly worn, carried, or transported. And, as mentioned, he asserts that, in any event, it is not a crime to do so. Defense counsel acknowledged at oral argument that no Maryland case has adopted the position that defendant advances here.

As noted, prior to October 2023, C.L. § 4-203(b)(2) excepted from prohibition the wear, carry, or transport of a handgun, so long as the individual is "in compliance with any limitations imposed under [P.S.] § 5-307 . . . by a person to whom a permit to wear, carry, or transport the handgun has been issued under Title 5, Subtitle 3 of the Public Safety Article." Notably, the "in compliance" language referred specifically to P.S. § 5-307. As amended, however, the phrase "in compliance with any limitations imposed under § 5-307 of the Public Safety Article . . ." has been deleted. The provision now excepts from the wear, carry prohibition the wear, carry, or transport "of a handgun by a person to whom a permit to wear, carry, or transport the handgun has been issued under Subtitle 3, Title 5 of the Public Safety Article[.]" As I see it, as amended, the statute is no longer limited to P.S. § 5-307. Rather, it references *all* of Subtitle 3, Title 5 of the Public Safety Article. Of course, that includes P.S. § 5-307.

P.S. § 5-307(b)(1) makes plain that a wear, carry handgun permit "*shall* restrict the wearing, carrying, and transporting of a handgun by the person to whom the permit is issued to wearing, carrying, or transporting a handgun *concealed* from view[.]" (Emphasis added). The word "shall" connotes that the limitations are mandatory, not discretionary. *See, e.g.*, *Bufkin v. Collins*, 604 U.S. 369, 379 (2025) ("It is undisputed that the word 'shall' imposes a mandatory command."). Indeed, the word "'[s]hall' means 'must.'" *Kingdomware Technologies, Inc. v.*

38

*United States*, 579 U.S. 162, 171-72 (2016) (alteration added); *see Hicks*, 2026 WL 1601794, at *7 (referencing P.S. § 5-306 and stating that, subject to certain requirements, Maryland citizens "are authorized to obtain *a concealed* carry permit . . . .") (emphasis added).  In particular, with a permit, P.S. § 5-307 provides for the concealed wear, carry, or transport of a handgun, under or within an article of clothing, or within an enclosed case.  P.S. § 5-307(b)(1)(i)(2).[20]

In arguing that Maryland allows open carry, with a permit, defendant hangs his hat on the deletion of a handful of words by the Maryland General Assembly in October 2023 from one statutory provision, and the insertion of those words in another provision.  On this basis, he suggests that the legislature effected a seachange in the law as to  wear, carry, notwithstanding that Maryland has long proscribed the open carry of handguns.  *See Whack*, 288 Md. at 146, 416 A.2d at 268 (recognizing that, even prior to 1972, Art. 27, § 36 prohibited the carrying of concealed weapons); C.L. § 4-203(b)(2); C.L. § 4-111(b)(11)(ii).

Defendant's argument fails at the start because, despite the deletion of a handful of words from C.L. § 4-203(b)(2), the remaining, unchanged text must be construed in accordance with its plain meaning.  As written, the text clearly provides that a person may only wear, carry, or transport a handgun with a permit to do so, obtained under Subtitle 3, Title 5 of the Public Safety Article.  And, P.S. § 5-307 plainly provides that a permit restricts the wear and carry to *concealed* wear and carry.

In support of defendant's position regarding the import of the change in the statutory text, defendant cites, *inter alia*, *Price v. State*, 378 Md. 378, 383, 835 A.2d 1221, 1224 (2003), and *Carter v. State*, 236 Md. App. 456, 479, 182 A.3d 236, 250 (2018).  But, these cases do not compel

---

[20] As indicated, an inadvertent or momentary exposure of a handgun does not constitute a violation of the statute.  P.S. § 5-307(2).

or even suggest that a court must conclude that an amendment to the text of a statute necessarily requires a court to find a change in the meaning of the text. These cases applied well honed principles of statutory construction in reaching conclusions about the particular legislative change in issue.

For example, in *Price*, 378 Md. at 389, 835 A.2d at 1227, the Maryland Court of Appeals considered whether the defendant's conviction for daytime housebreaking qualified as a crime of violence in light of a statutory amendment that omitted daytime housebreaking from a list of qualifying crimes in Article 27, § 441(e). The court said that its "refusal to read daytime housebreaking into the [amended] enumerated crimes [of violence] . . . is only an example of the ancient and sound rule of construction known as *inclusio est exclusio altrius* . . . . By including precise, statutory crimes in § 441(e), the General Assembly signals a clear intent to exclude any crimes missing from the list."

Moreover, defendant cites *Lawrence*, 475 Md. at 406, 257 A.3d at 601, for the proposition that "'when a legislature uses different words, especially in the same section . . . it usually intends different things.'" (quoting *Toler v. Motor Vehicle Admin.*, 373 Md. 214, 223, 817 A.2d 229, 235 (2003)). *See* ECF 58 at 5. But, the Maryland high court also said that "this rule is not 'immutable' . . . ." *Lawrence*, 475 Md. at 401, 257 A.3d at 601. In *Lawrence*, the Maryland Court of Appeals focused on the absence of the word "knowingly" from C.L. § 4-203(a)(1)(ii), involving wear and carry on a person, in contrast to the inclusion of that word in C.L. § 4-203(a)(1)(i), involving vehicles. In part, this persuaded the Court that the offense of wear, carry, or transporting a handgun on or about the person is a strict liability offense in Maryland. *Id.* at 397, 257 A.3d at 596.

The Maryland General Assembly could not have been more explicit in prohibiting the open wear, carry, or transport of a firearm. The Criminal Law Article expressly incorporates the permit requirement set forth in the Public Safety Article. The words that the Maryland legislature deleted in 2023 from C.L. § 4-203(b)(2) do not alter the meaning of the provision, and this Court need not strain credulity to find a new meaning merely because a handful of words were deleted by the Act in one provision and inserted in an entirely new provision, C.L. § 4-111. Indeed, no principle of statutory construction compels the Court to manufacture a new meaning for the revised provision, C.L. § 4-203(b)(2). Had the Maryland General Assembly intended to permit open carry, as defendant urges, "it could easily have included such language" in the statute. *Cf. United States v. Speed*, 175 F.4th 272, 280 (4th Cir. 2026) ("Had Congress intended to cover only devices currently operating as silencers, it could easily have included such language. But it did not.").

On a more granular level, defendant's construction of the statute is at odds with the common sense approach to statutory interpretation that the Maryland high court employed in interpreting this very statute. In *Lawrence*, 475 Md. 384, 257 A. 3d 568, decided in August 2021, before the amendment to C.L. § 4-203, the Maryland Court of Appeals held that, in enacting C.L. § 4-203(a)(1)(i), the Maryland General Assembly "intended to create a strict liability offense," although the provision makes no mention of any *mens rea*. *Id.* at 413, 257 A.3d at 605; *see id.* 389, 397, 422, 257 A.3d at 591, 595, 610. The court carefully analyzed the "plain text of the statute" and its precedent, *id.* at 397, 257 A.3d at 596, and noted that the statutory purpose supported that conclusion. *Id.* at 412, 257 A.3d at 605. In reaching that conclusion, the court also looked to the policy declaration for Article 27, § 36B and the legislative findings in C.L. § 4-202. *Id.* at 413, 257 A.3d at 414. If the Maryland General Assembly disagreed with the decision of the

41

Maryland Court of Appeals in *Lawrence*, it could have addressed the purported error in the Act. It did not do so.

Recently, in *Engage Armament LLC*, 2026 WL 1144313, the Maryland Supreme Court addressed local laws enacted by Montgomery County regarding the regulation of "ghost guns." What the court said about C.L. § 4-203(b) is noteworthy. The court observed that C.L. § 4-203(b) "does not provide the holders of carry permits with an affirmative right, but instead states only what '[t]his section does not prohibit[.]'[]" *Id.* at *22 (alterations in *Engage Armament*). The court added that its "conclusion also best matches the structure of the statutory scheme, which identifies a broad prohibition [on wear, carry] and several specific exceptions." *Id.*

In my view, the statutory text is clear and unambiguous. Therefore, the inquiry is at an end. There is no need for the Court to look further because there is no ambiguity as to the matter of open carry, with or without a permit. It is not allowed.

But, if there were any ambiguity as to the meaning of C.L. § 4-203—and I see none—the legislative history and the statutory purpose resolve the doubt. I previously reviewed the legislative history in Maryland as to handgun regulation. I need not repeat it here.

The legislative purpose with regard to the statutory scheme is quite useful. It is codified in C.L. § 4-202, which was left unchanged when the statute was amended in 2023. The General Assembly spoke loud and clear as to its intent. C.L. § 4-202, titled "Legislative findings," provides:[21]

The General Assembly finds that:

---

[21] A prior, similar provision is found in Art. 27, Md. Code Ann. § 36B(a). *See Whack*, 288 Md. at 147, 416 A.2d at 270 (citing the Declaration of Policy, Art. 27, § 36B(a), and noting that "the Legislature viewed handguns as a particularly aggravating problem . . .").

(1) the number of violent crimes committed in the State has increased alarmingly in recent years;

(2) a high percentage of violent crimes committed in the State involves the use of handguns;

(3) the result is a substantial increase in the number of deaths and injuries largely traceable to the carrying of handguns in public places by criminals;

(4) current law has not been effective in curbing the more frequent use of handguns in committing crime; and

(5) additional regulations on the wearing, carrying, and transporting of handguns are necessary to preserve the peace and tranquility of the State and to protect the rights and liberties of the public.

There is no indication that, in passing the Act in 2023, the Maryland General Assembly sought to upend its longstanding prohibition on open carry. Rather, as already discussed, the 2023 amendments to the FSA were prompted by the Supreme Court's decision a year earlier in *Bruen*, 597 U.S. 1.

To illustrate, on July 6, 2022, shortly after *Bruen* was decided, Patrick Hughes, Chief Counsel, Opinions & Advice, Office of the Maryland Attorney General, wrote to the Commander of the Licensing Division of the Maryland State Police, advising of the unconstitutionality of the "good-and-substantial-reason requirement" for a gun permit in P.S. § 5-306, in light of *Bruen*. *See Hicks*, Joint Concurrence, 2026 WL 1601794, at *30. The Maryland General Assembly acted in 2023 with "the backdrop of this legal advice.[]" *Id.* at *31.

A statewide association, Maryland Nonprofits, consisting of more than 1,500 nonprofit organizations, supported the proposed amended law in a letter of February 7, 2023, to the Maryland Senate Judicial Proceedings Committee. MARYLAND NONPROFITS, TESTIMONY ON SENATE BILL 1 'GUN SAFETY ACT OF 2023,' Sen. Jud. Procs. Comm. (Feb. 7, 2023), https://perma.cc/EJ3S-ZYR4 (last accessed May 13, 2026). It stated, in part, that the legislation "will strengthen what

*Bruen* has weakened by helping keep guns out of the hands of violent people and out of sensitive public places."

Maryland Attorney General Anthony Brown wrote to Governor Wes Moore on April 27, 2023, advising that the proposed statute, *i.e.*, the Act, "is legally sufficient and is not clearly unconstitutional.[]"  Letter from Anthony G. Brown, Att'y Gen. of Md., Office of Counsel to the Gen. Assembl., to Gov. Wes Moore, *Re: Senate Bill 1, 'Criminal Law – Wearing, Carrying, or Transporting Firearms – Restrictions (Gun Safety Act of 2023)'* (Apr. 27, 2023) at 1, https://perma.cc/RPQ7-PE6W (last accessed May 13, 2026).  Of note, Attorney General Brown stated that the proposed law "is consistent with the permissible boundaries set out in *Bruen . . . .*" *Id.* at 6.

The Maryland Department of Legislative Services ("DLS") supports the members of the Maryland General Assembly and its committees with research and other matters.  *Executive Director's Message,* MARYLAND GENERAL ASSEMBLY DEPARTMENT OF LEGISLATIVE SERVICES, https://perma.cc/7NR5-NCHL (last accessed May 19, 2026).  DLS reviewed Senate Bill 1, which became the Act, in a "Fiscal And Policy Note."  *See* DEP'T OF LEGIS. SERVS., FISCAL AND POLICY NOTE, ANALYSIS TO S.B. 1, 2023 Md. Gen. Assemb., 2023 Session, https://perma.cc/UWE9-6NTX (last accessed May 13, 2026).  It stated that the Act "establishes required restrictions on the wearing, carrying, and transporting of a handgun with a handgun permit."  *Id.* at 1.  Among other things, DLS also said, *id.* at 5:  "A handgun permit issued under the bill's provisions must restrict the wearing, carrying, and transporting of a handgun by the person to whom the permit is issued to wearing, carrying, or transporting a handgun *concealed from view . . . .*"  (Emphasis added).

The preamble to the Maryland 2023 Session Laws, 2023 Maryland Laws Ch. 680 (S.B. 1), is also informative, articulating the legislature's purpose in regard to the Act.  *See* ECF 37-1 at 1.

It states:

> FOR the purpose of prohibiting a person from knowingly wearing, carrying, or transporting a firearm in certain locations; prohibiting a person from wearing, carrying, or transporting a firearm onto certain property unless the owner or the owner's agent has given certain permission; altering certain provisions of law relating to the authority of the Secretary of State Police to limit the wearing, carrying, or transporting of a handgun at certain times and locations; and generally relating to restrictions on wearing, carrying, or transporting firearms.

These references support the conclusion that the goal of the Maryland legislature in 2023 was not to upend the statutory scheme by expanding the right to wear, carry, so as to include open carry. Rather, it sought to comply with *Bruen*. The legislature's "repeal and reenactment" of C.L. § 4-203 was made "with full awareness of the constitutional landscape and still [it] specifically chose to reenact" the statute. *Hicks*, Joint Concurrence, 2026 WL 1601794, at *31 n.12. The Act "reflect[s] the General Assembly's continuing effort to regulate the public carrying of firearms to the full extent permitted by the Second Amendment as interpreted by the U.S. Supreme Court." *Id.* at *31 n.13 (alteration added).

The Joint Concurrence in *Hicks* put it succinctly, stating, 2026 WL 160794, at *32: "The upshot is that Maryland's post-*Bruen* regime reflects a deliberate legislative judgment at every step. The General Assembly eliminated what the Constitution required it to eliminate, retained and reenacted the permit requirement, amended and strengthened the general prohibition, and did so with legal advice in hand opining that the prohibition remained constitutionally sound . . . It did not disturb the prohibition on carrying a handgun without a permit. It did not render [C.L.] § 4-203 unconstitutional."

In short, I reject defendant's contention that, in passing the Act in 2023, Maryland law now allows a person to wear, carry, or transport a handgun on his person, whether concealed or open, so long as he or she has a valid permit. ECF 33 at 8. Under C.L. § 4-203 and P.S. § 5-307, an

individual with a carry permit is not entitled to carry a handgun openly; the handgun must be concealed, with exemptions not applicable here. *See Hicks*, Joint Concurrence, 2026 WL 1601794, at \*39. Therefore, "a person whose handgun is visible to ordinary observation is engaged in conduct that is unlawful under P.S. § 5-307." *Id.* at 50 n.13 (Leahy, J., concurring).

The defendant also maintains that it is not a crime to violate C.L. § 4-203(a)(1)(i) or P.S. § 5-307. *See*, *e.g.*, ECF 37 at 2. Therefore, he contends that there could not possibly be a basis under *Terry* to conduct a stop of the defendant on the ground that he publicly displayed a firearm. This argument is fallacious.

The pertinent penalty provision is found in C.L. § 4-203(c). Section 4-203(c) provides that it is a crime to violate C.L. § 4-203. And, C.L. § 4-203 provides that one can lawfully carry a gun only with a permit issued pursuant to the Public Safety Article. Even with a permit, however, the gun must be concealed.

In *Whack*, 288 Md. at 139, 416 A.2d at 266, the Maryland Court of Appeals considered whether separate sentences could be imposed for the crimes of robbery with a deadly weapon and use of a handgun in the commission of a felony when the crimes were based on the same robbery. In concluding that the legislature authorized separate sentences, the court considered Maryland's handgun control statute, then found in Art. 27, §§ 36B-36F. The court noted that, in the 1972 version of the handgun statute, which I discussed earlier, the legislature "was concerned with the matter of duplicative legislation. Where it desired no duplication it specifically amended or superseded those other statutes." *Id.* at 146, 416 A.2d at 270. For example, the legislature amended Art. 27, § 36 "to expressly delete handguns from the coverage of the concealed weapons statute." *Id.*, 416 A.2d at 269.

The *Whack* Court also said, *id.* at 147, 416 A.2d at 270: "The language of the 1972 handgun statute confirms that there was no intent to delete by implication penalties provided by other statutes, and confirms that the penalties set forth in the handgun act were intended to be imposed, in addition to the penalties under other applicable statutes."

Defendant's suggestion that the wear, carry law is not a criminal statute flies in the face of Maryland law.

### B. Discussion

Given that defendant was seen openly displaying a handgun on a public street in Baltimore, the government largely relies on *Terry v. Ohio*, 392 U.S. 1 (1968), to support the seizure of the defendant and the subsequent search of his car.

Fallin cries foul. He claims that, when the police see a person openly displaying a handgun, they "cannot justify a stop by simply assuming, without evidence, that he lacks a permit." ECF 33 at 8. But, his claim of error is unfounded.

As discussed at length, with exceptions not applicable here, it is illegal in Maryland to openly and publicly carry a gun, even with a permit. In Judge Nazarian's concurrence in *Hicks*, 2026 WL 1601794, he stated, *id.* at 39: "An officer who sees a person carrying a gun openly . . . will still have reasonable articulable suspicion that the person may be committing a crime . . . ." Notably, he added, *id.*: "And that will be true especially for anyone holding a firearm in their hand . . . let alone brandishing . . . a firearm . . . . The guns that are the easiest to see, that are visible objectively, will continue to give rise to more-or-less instant probable cause." Indeed, "[v]isible, noncompliant carry is . . . a dispositive, objective predicate for a *Terry* stop." *Id.* at 50 n.13 (Leahy, J., concurring). That is the situation here.

### 1.

47

I begin with a review of the Fourth Amendment to the Constitution as well as *Terry* and its progeny.  The Fourth Amendment guarantees, *inter alia*, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ."  Thus, it protects against unreasonable searches and seizures.  *See Utah v. Strieff*, 579 U.S. 232, 237-38 (2016); *United States v. Mendenhall*, 446 U.S. 544, 551 (1980) (plurality opinion).

By its plain text, however, the Fourth Amendment "does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable."  *Florida v. Jimeno*, 500 U.S. 248, 250 (1991); *see Illinois v. Rodriguez*, 497 U.S. 177, 183-84 (1990); *United States v. Sharpe*, 570 U.S. 675, 682 (1985); *Mendenhall*, 446 U.S. at 551.  Indeed, "the ultimate touchstone of the Fourth Amendment is reasonableness."'  *Riley v. California*, 573 U.S. 373, 381 (2014) (citation and some quotation marks omitted); *see Fernandez v. Calif.*, 571 U.S. 292, 298 (2014); *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006); *Maryland v. Wilson*, 519 U.S. 408, 411 (1997); *Jimeno*, 500 U.S. at 250.

Generally, warrantless seizures and searches are per se unreasonable, subject only to a few well established exceptions.  *See Riley*, 573 U.S. at 382 (stating that, "[i]n the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement"); *see also Kentucky v. King*, 563 U.S. 452, 459-60 (2011); *Katz v. United States*, 389 U.S. 347, 357 (1967); *United States v. Feliciana*, 974 F.3d 519, 522 (4th Cir. 2020); *United States v. Bowman*, 884 F.3d 200, 209 (4th Cir. 2018).  The government bears the burden of justifying a warrantless seizure.  *Feliciana*, 974 F.3d at 523; *United States v. Kehoe*, 893 F.3d 232, 237 (4th Cir. 2018); *United States v. McGee*, 736 F.3d 263, 269 (4th Cir. 2013).

What has become known as the "*Terry* stop and frisk" is one of the exceptions to the warrant requirement.  *Terry*, 392 U.S. 1.  *Terry* permits a police officer to stop and temporarily

48

detain an individual for investigative purposes, without violation of the Fourth Amendment's prohibition against unreasonable searches and seizures, so long as the officer has a reasonable, articulable suspicion, based on specific facts, that criminal activity is afoot. *Id.* at 21- 22, 30; *see United States v. Peters*, 60 F.4th 855, 862 (4th Cir. 2023).

The purpose of a *Terry* stop is investigative — to verify or to dispel the officer's suspicion surrounding the suspect. *Terry*, 392 U.S. at 22, 30. *Terry* sets forth a "dual" inquiry standard. *Id.* at 20. The court examines "'whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'" *Sharpe*, 470 U.S. at 682 (quoting *Terry*, 392 U.S. at 201); *see Arvizu*, 534 U.S. at 273; *Reid v. Georgia*, 448 U.S. 438, 440 (1980) (per curiam); *United States v. Martin*, 173 F.4th 110, 114 (4th Cir. 2026); *Feliciana*, 974 F.3d at 522; *United States v. Bernard*, 927 F.3d 799, 805 (4th Cir. 2019); *United States v. Hill*, 852 F.3d 377, 381 (4th Cir. 2017); *United States v. Williams*, 808 F.3d 237, 245 (4th Cir. 2015); *United States v. Slocumb*, 804 F.3d 677, 681 (4th Cir. 2015).

Under the second prong, the stop must be reasonable in scope and duration. *United States v. Digiovanni*, 650 F.3d 498, 507 (4th Cir. 2011), *abrogated in part on other grounds by Rodriguez v. United States*, 575 U.S. 348 (2015) (citing *Florida v. Royer*, 460 U.S. 491, 500 (1983)) (purality opinion). Analyzing the scope and duration components involves "highly fact-specific inquiries. . . ." *United States v. Guijon-Ortiz,* 660 F.3d 757, 764 (4th Cir. 2011). Lawful duration is not subject to mathematical precision. *United States v. Branch*, 537 F.3d 328, 336-37 (4th Cir. 2008), *cert. denied*, 555 U.S. 1118 (2009). But, a lawful stop "can become unlawful if it is prolonged beyond the time reasonably required to complete [the] mission" at hand. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

49

The "test of reasonableness under the Fourth Amendment is an objective one." *Los Angeles County v. Rettele,* 550 U.S. 609, 614 (2007) (citing *Graham v. Connor,* 490 U.S. 386, 397 (1989)). Reasonableness is determined by balancing "the intrusion on the individual's Fourth Amendment interests against [the] promotion of legitimate governmental interests." *Maryland v. Buie*, 494 U.S. 325, 331 (1990). The Supreme Court explained in *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) (per curiam): "Reasonableness, of course, depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'" (Quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)); *see also Sokolow*, 490 U.S. at 9. The Fourth Circuit has said: "The magnitude of the intrusion relative to the seriousness of any offense 'is of central relevance to determining reasonableness[.]'" *United States v. Lyles*, 910 F.3d 787, 796 (4th Cir. 2018) (quoting *Maryland v. King*, 569 U.S. 435, 446 (2013)).

In *Santos v. Frederick County Bd. of Com'rs*, 725 F.3d 451 (4th Cir. 2013), the Fourth Circuit summarized "three categories of police-citizen encounters," including a *Terry* stop. It said, *id.* at 460-61:

> First, "consensual" encounters, the least intrusive type of police-citizen interaction, do not constitute seizures and, therefore, do not implicate Fourth Amendment protections. *Florida v. Bostick*, 501 U.S. 429, 434[] (1991). Second, brief investigative detentions—commonly referred to as "*Terry* stops"—require reasonable, articulable suspicion of criminal activity. *Terry* [*v. Ohio*, 392 U.S. 1, 21 (1968)]. Finally, arrests, the most intrusive type of police-citizen encounter, must be supported by probable cause. *Devenpeck v. Alford*, 543 U.S. 146, 152[] (2006).
>
> A police-citizen encounter rises to the level of a Fourth Amendment seizure when "the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen . . . ." *United States v. Jones*, 678 F.3d 293,

299 (4th Cir. 2012) (quoting *Terry*, 392 U.S. at 19 n.16 [ ]).  This inquiry is objective, [*United States v.*] *Weaver*, 282 F.3d [302, 309 (4th Cir. 2002)], asking whether "'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'"  *Jones*, 678 F.3d at 299 (quoting *Mendenhall*, 446 U.S. at 553 [ ]).  An encounter generally remains consensual when, for example, police officers engage an individual in routine questioning in a public place.  *United States v. Gray*, 883 F.2d 320, 323 (1989); *see also Bostick*, 501 U.S. at 434[ ] ("[M]ere police questioning does not constitute a seizure.").

For purposes of the Fourth Amendment, a seizure occurs "when the officer, 'by means of physical force or show of authority,' terminates or restrains [the suspect's] freedom of movement." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (citations and some quotation marks omitted).  In *Torres v. Madrid,* 592 U.S. 306, 309 (2021), the Supreme Court said: "The application of physical force to the body of a person with intent to restrain is a seizure . . . ."  The Court added, *id.* at 312: "The 'seizure' of a 'person' plainly refers to an arrest."  The *Torres* Court cited *California v. Hodari D.*, 499 U.S. 621, 624 (1991), for the proposition that an arrest is the application of physical force with the intent to restrain.  *See Torres*, 592 U.S. at 312; *see also United States v. Cloud*, 994 F.3d 233, 241 (4th Cir. 2021).  A show of authority is an objective standard, measured as to a reasonable person.  *Mendenhall,* 446 U.S. at 554; *Cloud*, 994 F.3d at 242.  But, no seizure occurs in the absence of a submission to authority.  *Hodari D.*, 499 U.S. at 628-29; *United States v. Stover*, 808 F.3d 991, 996 (4th Cir. 2015).

As to a show of authority, "a person has been seized within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 554-55; *see Michigan v. Chesternut*, 486 U.S. 567, 573 (1988).  To determine if a reasonable person would feel free to leave, courts consider the totality of the circumstances, "measured objectively" from the "perspective" of a reasonable person.  *Cloud*, 994 F.3d at 242.  But, a show of authority "does not

become an arrest unless and until the arrestee complies with the demand." *Torres*, 592 U.S. at 311; *see Hodari D.*, 499 U.S. at 626.

When a police officer conducts a vehicular stop and detains the occupant, the stop constitutes a seizure that implicates the Fourth Amendment. *Kansas v. Glover*, 589 U.S. 376, 380 (2020); *see, e.g., Heien v. No. Carolina*, 574 U.S. 54, 61 (2014); *Brendlin*, 551 U.S. at 255; *Whren v. United States*, 517 U.S. 806, 809-10 (1996); *Sharpe*, 470 U.S. at 682; *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *Martin*, 173 F.4th at 114; *Cloud*, 994 F.3d at 241; *United States v. Drakeford*, 992 F.3d 255, 262 (4th Cir. 2021); *United States v. Curry*, 965 F.3d 313, 319 (4th Cir. 2020) (en banc); *United States v. White*, 836 F.3d 437, 440 (4th Cir. 2016); *United States v. Ortiz*, 669 F.3d 439, 444 (4th Cir. 2011). Reasonable suspicion to justify the stop requires "'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Glover*, 589 U.S. 380 (citation omitted); *see Ornelas v. United States*, 517 U.S. 690, 696 (1996) (stating that reasonable suspicion is "a particularized and objective basis for suspecting the person stopped of criminal activity. . . ."); *see also Wingate v. Fulford*, 987 F.3d 299, 305 (4th Cir. 2021); *Feliciana*, 974 F.3d at 523; *Williams*, 808 F.3d at 246; *United States v. Black,* 707 F.3d 531, 539 (4th Cir. 2013); *United States v. Massenburg*, 654 F.3d 480, 486 (4th Cir. 2011); *United States v. Griffin,* 589 F.3d 148, 152 (4th Cir. 2009). But, it "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence," although a "minimal level of objective justification [is required] for making the stop." *Wardlow*, 528 U.S. at 123; *see United States v. Critchfield*, 81 F.4th 390, 393 (4th Cir. 2023); *United States v. Lawing*, 703 F. 3d 229, 236 (4th Cir. 2012).

The matter of reasonable, articulable suspicion is sometimes elusive. Indeed, the Supreme Court has acknowledged the difficulty in pinpointing exactly what is meant by the term

"articulable suspicion."  *Ornelas*, 517 U.S. at 699-700.  Moreover, the court has recognized that the standard is "'not readily, or even usefully, reduced to a neat set of legal rules.'"  *Id.* at 695-96.  However, "the detaining officer [must] '. . . either articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance.'"  *Williams*, 808 F.3d at 246 (citation omitted).  Nevertheless, the Supreme Court has "consistently recognized that reasonable suspicion 'need not rule out the possibility of innocent conduct.'"  *Prado Navarette v. California*, 572 U.S. 393, 403 (2014) (citation omitted).

Of import, "[t]he standard 'depends on the factual and practical considerations of everyday life on which *reasonable and prudent men*, not legal technicians, act.'"  *Glover*, 589 U.S. at 380 (citations omitted) (emphasis in *Glover*).  Moreover, police officers must be permitted to make "'commonsense judgments and inferences about human behavior.'"  *Id.* (citation omitted); *see Navarette*, 572 U.S. at 404.  So, in assessing reasonable suspicion, courts must "give due weight to commonsense judgments reached by officers in light of their experience and training."  *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004); *see United States v. Smart*, 91 F.4th 214, 223 (4th Cir. 2024) (recognizing that the court gives "due deference to 'the practical experience of officers who observe on a daily basis what transpires on the street.'")  (citation omitted); *see also Critchfield*, 81 F.4th at 395; *Feliciana*, 974 F.3d at 525; *United States v. McBride*, 676 F.3d 385 (4th Cir. 2012); *United States v. Sowards*, 690 F.3d 585, 587-88 (4th Cir. 2012); *United States v. Johnson*, 599 F.3d 339, 343 (4th Cir. 2010); *Branch*, 537 F.3d at 336-37.

When "a district court finds an officer to be a credible witness, it may rely on inferences that the officer draws based on his training and experience to support reasonable suspicion."  *Smart*, 91 F.4th at 225.  But, a mere "'hunch'" or "'inchoate and unparticularized suspicion'" is

53

not enough. *Wardlow*, 528 U.S. at 124 (citation omitted); *see Critchfield*, 81 F.4th at 393; *United States v. Gist-Davis*, 41 F.4th 259, 264 (4th Cir. 2022).

As indicated, the matter of reasonableness is an objective one. *Rettele*, 550 U.S. at 614. Therefore, the officer's subjective state of mind is not considered. *United States v. George*, 732 F.3d 296, 299 (4th Cir. 2013); *United States v. Powell*, 666 F.3d 180, 186 (4th Cir. 2011). Nevertheless, in *Heien*, 574 U.S. at 61, the Supreme Court said: "Reasonable suspicion arises from the combination of an officer's understanding of the facts and his understanding of the relevant law." The Court added, *id.*: "The officer may be reasonably mistaken on either ground."

To be sure, an officer's subjective understanding of the law is generally not relevant, because reasonable suspicion is an objective test. *See*, *e.g.*, *Frazier*, 98 F.4th at 113; *United States v. Hinton*, 773 Fed. App'x 732, 734 (4th Cir. 2019) (per curiam). But, "[a]n officer's mistake of law may be reasonable if the law is ambiguous, such that reasonable minds could differ on the interpretation, or if it has never been previously construed by the relevant courts." *Hinton*, 773 Fed. App'x at 734 (*citing Heien*, 574 U.S. at 54). And, the Court is mindful that "'post-*Bruen*, jurisprudence on the intersection of the Second and Fourth Amendment protections is in its infancy.'" *Hicks*, 2026 WL 1601794, at *12 (quoting defense brief).

In determining reasonable suspicion, a court considers the the "'totality of the circumstances . . . known to the officers at the time of the stop.'" *United States v. Frazer*, 98 F.4th 102, 110 (4th Cir. 2024) (citation omitted); *see District of Columbia v. R.W.*, 608 U.S. ___, 146 S. Ct. 1069, 1070 (2026); *Arvizu*, 534 U.S. at 273; *Wardlow*, 528 U.S. at 123; *Sokolow*, 490 U.S. at 7-8; *Smart*, 91 F.4th at 223; *Cloud*, 994 F.3d at 242; *Bowman*, 884 F.3d at 214, 218. In other words, "the facts and observations available are considered in the aggregate, not separated in a

'divide-and-conquer analysis.'" *Frazer*, 98 F.4th at 110 (quoting *Arvizu*, 534 U.S. at 274). Indeed, the Supreme Court recently cautioned against "reviewing facts piecemeal and without context." *R.W.*, 146 S.Ct. at 1072. It reiterated that "'the whole is often greater than the sum of its parts — especially when the parts are viewed in isolation.'" *R.W.*, 146 S. Ct. at 1072 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 60-61 (2018)).

"A host of factors can contribute to a basis for reasonable suspicion, including the context of the stop, the crime rate in the area, and the nervous or evasive behavior of the suspect." *George*, 732 F.3d at 299 (citing *Wardlow*, 528 U.S. at 124).[22] And, "[f]acts innocent in themselves may together amount to reasonable suspicion." *United States v. Mitchell*, 963 F.3d 385, 390 (4th Cir. 2020); *see Sokolow*, 490 U.S. at 9-10.

Although the high-crime nature of an area where a stop is performed is generally not a dispositive factor in the analysis, it remains a relevant consideration under *Terry*. *See Wardlow*, 528 U.S. at 124; *United States v. Bumpers*, 705 F.3d 168, 175 (4th Cir. 2013). Moreover, "[a] suspect's suspicious movements can also be taken to suggest that the suspect may have a weapon." *George*, 732 F.3d at 299. To be sure, these facts could be entirely innocent. And, the Fourth Circuit has repeatedly "admonished against the Government's misuse of innocent facts as indicia of suspicious activity." *Black*, 707 F.3d at 538; *see Powell*, 666 F.3d at 182-83; *Massenburg,* 654 F.3d at 490; *DiGiovanni,* 650 F.3d 498; *United States v. Foster,* 564 F.3d 243 (4th Cir. 2011).[23]

---

[22] The ulterior motive of the police in making a traffic stop is irrelevant. *Whren*, 517 U.S. at 810, 813. As the Supreme Court and the Fourth Circuit have made clear, a pretextual traffic stop is not illegal, so long as it is predicated on reasonable and articulable suspicion of a traffic offense, or probable cause, and the scope and duration of the stop are appropriate. *See, e.g., Arvizu*, 534 U.S. at 273. And, the occupants of the vehicle, including passengers, may be ordered out of the vehicle. *Wilson*, 519 U.S. at 415.

[23] For example, a "driver's nervousness is not a particularly good indicator of criminal activity, because most everyone is nervous when interacting with the police." *United States v. Palmer*, 820 F.3d 640, 652-53 n.7 (4th Cir. 2016); *see Bowman*, 884 F.3d at 214; *Massenburg*,

As noted, however, a court must also give due weight to an officer's commonsense judgments. *Glover*, 589 U.S. at 376. The court "must not discount the officers' experience and training 'to detect the nefarious in the mundane.'" *Critchfield*, 81 F.4th at 395 (quoting *United States v. McCoy*, 513 F.3d 405, 415 (4th Cir. 2008)).

When taken together, such facts could give rise to reasonable suspicion. *Arvizu*, 534 U.S. at 274. In other words, the court must evaluate "cumulative information" available to the officer. *McBride*, 676 F.3d at 392. And, "'[t]o be reasonable is not to be perfect.'" *Glover*, 589 U.S. at 381 (citation omitted); *see Heien*, 574 U.S. at 61.

**2.**

On the evening of February 4, 2025, Detective Mendez was conducting surveillance by way of a CitiWatch camera. He saw defendant withdraw a handgun from his waistband. The defendant was in an area of Baltimore regarded as a high crime area. Indeed, a murder had occurred about ten days earlier, about a block from the location in issue. When Mendez saw defendant remove a handgun from his waistband, he immediately alerted members of the DAT, who were in the area. They proceeded to defendant's location, where defendant was observed making furtive movements while in the driver's seat of a black sedan.

---

654 F.3d at 490. "[A]bsent signs of nervousness beyond the norm," nervousness is not a basis for reasonable suspicion. *Massenburg*, 654 F.3d at 490 (citation omitted). Nor is there anything "intrinsically suspicious or nefarious about the occupant of a vehicle not making eye contact with an officer during a traffic stop." *Bowman*, 884 F.3d at 215; *see Massenberg*, 654 F.3d at 489.

Similarly, "'the mere presence of fast-food wrappers . . . is entirely consistent with innocent travel . . . .'" *Bowman*, 884 F.3d at 216 (citation omitted). And, although some drug dealers use rental vehicles, use of a rental car "is of minimal value to the reasonable-suspicion evaluation" because "the overwhelming majority of rental car drivers . . . are innocent travelers with entirely legitimate purposes." *Williams*, 808 F.3d at 247.

This case does not involve a traffic stop for a traffic violation.  Rather, the police conducted the stop of defendant for investigative reasons, based on a report that he had openly displayed a handgun on a Baltimore City street.  As Detective Klein indicated, this was not a matter of surmise; defendant's possession of a gun was captured on video.  ECF 46 at 85.  The BPD officers involved in this case also understood Maryland law to prohibit the open wear, carry of a handgun.  Further, they believed that, under the law in Maryland an individual cannot lawfully possess a handgun unless the individual has a permit to do so.

The collective knowledge doctrine applies to the DAT officers who responded to the scene after Detective Mendez reported that defendant openly displayed a handgun.  It provides that "when an officer acts on an instruction from another officer, the act is justified if the instructing officer had sufficient information to justify taking such action herself."  *Massenburg*, 654 F.3d at 492.  But, the doctrine also applies when an officer acts on information known by another officer. *Id.*; *see United States v. McCallister*, 2022 WL 1619029, at \*1 (4th Cir. May 23, 2022) (per curiam) (stating that "under the collective knowledge doctrine, 'when an officer acts on [information] from another officer, the act is justified if the *[informing] officer* had sufficient information to justify taking such action [him]self.' . . . In this situation, 'the *[informing] officer's* knowledge is imputed to the acting officer.'"); *United States v. Ferebee*, 957 F.3d 406, 411 (4th Cir. 2020) (stating that the "collective-knowledge doctrine focuses solely on the knowledge of the police officers"); *United States v. Blauvelt*, 638 F.3d 281, 289 (4th Cir. 2011) (stating that the "collective knowledge doctrine applies when at least some, but not all, of an investigative team has actual knowledge of facts necessary to a finding of probable cause . . . .  The knowledge is imputed from one officer to another such that the officers collectively are assumed to have actual knowledge of the imputed fact."); *see also United States v. Patituka*, 804 F.3d 684, 691 (4th Cir. 2015); *United States v.*

57

*Laughman*, 618 F.2d 1067, 1072-73 (4th Cir. 1980); *United States v. Herevia*, RDB-13-639, 2014 WL 4784321, at *5 (D. Md. Sept. 23, 2014).

Defendant contends that the collective knowledge doctrine is inapplicable because Detective Mendez did not "order," "instruct," or "direct" the DAT to stop the defendant. ECF 47 at 7. Rather, Mendez "merely informed the DAT that Mr. Fallin had a handgun." *Id.*

Mendez testified at the hearing that, when he saw defendant pull the gun from his waistband, he telephoned Detective St. Surin to tell him. ECF 46 at 59-60. Mendez also sent him a text with a screenshot as well as a video clip for the DAT "to respond over there to further investigate Mr. Fallin." *Id.* at 60.

It is not clear whether Mendez had formal authority to "order," "direct," or "instruct" members of the DAT. But, the law does not require the use of particular words, or countenance semantic quibbling. In *Massenburg*, 654 F.3d at 492, the Fourth Circuit recognized that the doctrine applies to officers acting on the instruction of other officers, as well as to officers acting on information obtained from other officers.

I turn to the scope and the duration of the stop. Both were reasonable. Upon arrival, the officers quickly removed defendant from the car, handcuffed him, and frisked him. Defendant does not specifically challenge the frisk. But, a police officer must have a reasonable suspicion that the suspect is both armed and dangerous to justify a frisk. *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). However, certainty as to whether a suspect is armed is not required. *Terry*, 392 U.S. at 27. And, as discussed, *infra*, in the context of a *Terry* stop, the law seems to equate an armed individual with a dangerous one. Defendant was frisked for officer safety because the officers were informed that defendant had a gun, which is a deadly weapon.

Moreover, Detective Klein promptly asked the defendant if he had a permit to carry the handgun. That question was clearly consistent with the investigatory reason for the stop. Klein testified that, if defendant had a permit, he would not have detained the defendant. It was his view that, if defendant had a wear, carry permit, he would have been entitled to possess the handgun, and that was what Klein sought to investigate. About three minutes after the stop began, the gun was found during a sweep of the passenger compartment of the defendant's vehicle.

To the extent that Detective Klein would not have detained defendant if he had a permit, despite Maryland's prohibition against open carry, defendant does not contend that this rendered the stop illegal. The Supreme Court said in *Heien*, 574 U.S. at 61, that "reasonable men make mistakes of law, too, and such mistakes are no less compatible with the concept of reasonable suspicion. Reasonable suspicion arises from the combination of an officer's understanding of the facts and his understanding of the relevant law. The officer may be reasonably mistaken on either ground." However, mistakes of fact and law "must be *objectively* reasonable." *Id.* at 66 (emphasis in *Heien*). Therefore, the court does "not examine the subjective understanding of the particular officer involved." *Id.* The Court added, *id.* at 67: "But just because mistakes of law cannot justify either the imposition or the avoidance of criminal liability, it does not follow that they cannot justify an investigatory stop."

As addressed at length, defendant makes much of the fact that the police had no basis to believe that he lacked a permit to carry the handgun. *See*, *e.g.*, ECF 33 at 6, 8, 10. To reiterate, he asserts, *id.* at 8: "Officers who see someone with a handgun cannot justify a stop by simply assuming, without evidence, that he lacks a permit. And here, police were not aware of any facts indicating Mr. Fallin did not have a handgun permit."

The defendant's argument as to open carry is without merit, for the reasons stated earlier. As indicated, even if defendant had a permit to carry a gun, it is illegal in Maryland for an individual to openly display a handgun, with exceptions not applicable here. The right to *carry* a handgun publicly is distinct from the right to *openly* carry a handgun. *See* ECF 34 at 20-23, 27. In Maryland, a law abiding citizen has the right to *carry* a handgun in public if he has a valid permit. *Id.* But, under Maryland law, even with a valid permit, the gun must be carried in a concealed manner; it may not be openly displayed.

Defendant was observed openly displaying a handgun, albeit briefly, and that conduct is plainly illegal in Maryland. The issue of whether the police had any reason to believe that defendant lacked a permit is beside the point. It follows that the BPD conducted a lawful *Terry* stop based on Detective Mendez's report that he saw defendant remove a handgun from his waistband while defendant was on a public street. The BPD officers were entitled—indeed obligated—to investigate.

Fallin relies on cases such as *Feliciana*, 974 F.3d 519 (*see* ECF 33 at 16), and *Black*, 707 F.3d 531 (*see* ECF 33 at 8), to support his claim that mere possession of a firearm does not constitute reasonable, articulable suspicion, because the officers had no way to know whether defendant had a permit to carry the gun. These cases are inapposite because this case is not about mere possession of a handgun. Rather, defendant openly displayed a handgun, in violation of Maryland law.

In *Black*, the Court noted that North Carolina "permit[s] its residents to openly carry firearms," and therefore one of the men in a group of loiterers "legally possessed and displayed" his gun. *Id.* at 540. The Court said that "where a state permits individuals to openly carry firearms," it follows that "the exercise of this right, without more, cannot justify an investigatory detention."

*Id.* But, as indicated, Maryland is not an open carry state, despite defendant's insistence to the contrary. *See, e.g., Evans v. State*, 2026 W.L. 123877, at *6 (Md. App. Ct. Jan. 16, 2026) (unreported). Therefore, *Black* is not applicable. With or without a permit, an individual in Maryland cannot openly carry a handgun, subject to exceptions that do not pertain to the defendant.

*Feliciana*, 974 F.3d 519, is also unavailing. There, a U.S. Park Police Officer stopped the defendant for driving a delivery truck on a parkway where commercial vehicles may operate only with a permit. The officer stopped the truck based solely on his observation of it on the road. *Id.* at 522. The officer asked the driver, *i.e.*, the defendant, for his permit, which the defendant could not produce. *Id.* The officer then searched the vehicle and recovered. *Id.*

The officer did not identify any reason to suspect that the defendant lacked the required permit. *Id.* at 523, 524. Rather, he stopped the vehicle merely because a permit is required. *Id.* The Court said, *id.* at 524: "The mere existence of the permit requirement does not, by itself, amount to reasonable suspicion that a particular driver failed to satisfy that requirement." The Court added, *id.* at 525: "We cannot infer from a permitting scheme's mere existence that a particular driver lacks the required permit." On the other hand, said the Court, an officer is not "powerless to stop a commercial vehicle on the parkway if the officer actually possesses reasonable suspicion that the vehicle lacks the required permit." *Id.*

Moreover, defendant's reliance on *United States v. Lora*, GLR-23-00244, is not persuasive. *See* ECF 33-4. *Lora* concerned events in April 2023, a few months before the Act went into effect in October 2023. *Id.* at 71. There, a BPD detective operating a CitiWatch camera "saw what appeared to be a handgun on the individual's hip." *Id.* at 13; *see id.* at 14, 44. A fellow detective also saw the handgun. *Id.* at 33. The defendant was arrested after he was asked if he had a permit for the gun and responded that the gun belonged to his brother. *Id.* at 34.

Judge Russell sated that "there was no law expressly prohibiting open carry . . . with a permit." *Id.* at 71. The Court also said, *id.* at 72: "And the mere presence of having a firearm does not start with a presumption that he is unlicensed." Further, the court said that "there was nothing about Mr. Lora's behavior which gave rise to an articulable suspicion that criminal activity was afoot . . . ." *Id.* The court added, *id.* at 73: "I do not believe that . . . the stop was supported by reasonable suspicion on articulable facts that criminal activity was afoot."

As best I can determine, at the suppression hearing, there were two brief references to C.L. § 4-203. *Id.* at 52, 65. But, there was no meaningful discussion of the statute. And here, the validity of defendant's argument depends on a construction of the statutory scheme that I reject.

It follows that the cases cited by defendant, involving open carry laws, are largely inapplicable. Similarly, the cases cited by the defendant concerning concealed carry states, where the firearm was concealed, are also largely inapplicable. *See* ECF 33 at 13-17, 21-26.

In *United States v. Wilson*, 143 F.4th 647 (5th Cir. 2025), for example, the court reviewed the legality of a *Terry* stop under Louisiana law, which prohibited possession of a concealed handgun, except for persons with a valid permit. *Id.* at 655-56. Federal agents stopped the defendant after noticing a "bulge" in the defendant's waist area. *Id.* at 651. They believed it was a concealed firearm. *Id.* While the defendant was being handcuffed, he admitted that he did not have a permit for the gun. *Id.* at 652. The defendant moved to suppress the evidence and his statements, claiming an unlawful *Terry* stop. *Id.* The Fifth Circuit rejected the district court's conclusion that carrying a firearm was "presumptively" unlawful under Louisiana law. *Id.* at 655. Nevertheless, it upheld the *Terry* stop, based on the totality of circumstances. *Id.* at 659. In any event, the facts do not indicate that the defendant in *Wilson* ever openly displayed the gun. *Id.* at 651-52. That fact is in marked contrast to the facts here.

On June 4, 2026, as the ink was drying on this Memorandum Opinion, the Maryland Appellate Court, sitting en banc, issued a scholarly and comprehensive opinion, with several concurrences, addressing, *inter alia*, the legality of a *Terry* stop by the BPD based, *inter alia*, on the outline or imprinting of the handle of a handgun in defendant's waistband, visible through the defendant's t-shirt. *See Hicks*, 2026 WL 1601794, at *1. When the defendant was stopped, he immediately claimed that he had a license for the gun. *Id.* The stop led to the recovery of a gun from defendant's person and another gun and CDS from a cross-body satchel that the defendant was wearing. *Id.*

Of import, the incident occurred in July 2023, a few months before the Act went into effect. *Id.* at *16. The court majority held that, "post-*Bruen*, reasonable suspicion to believe that a person is carrying a gun, by itself, no longer justifies a *Terry* stop." *Id.* at *14. Indeed, the court majority concluded that its decision was "compelled" by *Bruen*. *Id.* at *15. Because the defendant was stopped "solely on his possession of a gun," the court's majority found that the stop violated the Fourth Amendment. *Id.* at *17.

This case is distinguishable from *Hicks* for several key reasons. First, the statutory scheme at issue here is not the one at issue in *Hicks*. Rather, this case concerns the Act of 2023, effective October 2023. As best I can determine, the parties in *Hicks* did not present a statutory argument as to open carry, and the court did not address one. The court majority in *Hicks* pointed out that no argument was made in that case under P.S. § 5-307(b)(1), which requires a person with a permit to carry only a concealed weapon. *Hicks*, 2026 WL 1601794, at *16. Second, Fallin was not stopped for mere suspicion of possession of a gun. This is not a case where the police conducted a stop because they saw a gun, or the outline of a gun, under the defendant's clothes. Rather, Fallin openly displayed the handgun, which is clearly illegal in Maryland, without regard to his status as

a possible permittee.  The BPD officers were acting pursuant to and in compliance with Maryland law, by which it is unlawful for an ordinary citizen to openly display a weapon, with or without a valid permit to carry.

I must also consider C.L. § 4-206.  It expressly permits a Maryland law enforcement officer to "make an inquiry and conduct a limited search of a person" if, "in light of the officer's observations, information, and experience," the officer "reasonably believes," *inter alia*, that "the person may be wearing, carrying, or transporting a handgun in violation of § 4-203 . . . [and] may be dangerous to the officer or to others[.]"  C.L. §§ 4-206(a)(1)(i), (iii).

Defendant contends, *inter alia*, that "[t]here is no basis to conclude that Mr. Fallin was 'dangerous to the officer[s] or to others' . . . ."  ECF 54 at 8 (citing C.L. § 4-206(a)(1)(ii)).  But, Fallin seems to overlook the inherent dangers of a handgun, which Detective Mendez saw in defendant's possession.  Indeed, a gun "is typically and characteristically dangerous . . . and the law reasonably may presume that such an article is always dangerous[.]"  *McLaughlin v. United States*, 476 U.S. 16, 17 (1986); *see also State v. Sizer*, 230 Md. App. 640, 651, 149 A.3d 706, 713 (2016) ("Licensed handguns shoot bullets that are just as deadly as are those from unlicensed handguns."), *aff'd*, 456 Md. 350 (2017).

In addition, under C.L. § 4-206(a)(2), if the criteria of § 4-206(a)(1)(i), (ii), (iii), and (iv), are met, the officer may, *inter alia*, "ask any question [of the person] and request any explanation that may be reasonably calculated to determine whether the person is unlawfully wearing, carrying, or transporting a handgun in violation of § 4-203 . . . ."  C.L. § 4-206(iv).  Further, the officer may frisk a person if the explanation does not dispel the officer's concerns.  C.L. § 4-206(v).  And, the officer "may demand evidence from the person" as to "the person's authority to wear, carry, or transport the handgun in accordance with § 4-203(b) . . . ."  C.L. § 4-206(b)(1).  Under C.L. § 4-

206(b)(2), the person's failure to produce the evidence entitles the police to "seize the handgun and arrest the person."

To be sure, the statutory provisions in C.L. § 4-206 cannot vitiate the Fourth Amendment. But, the provision "set[s] out a sensible procedure and a constitutionally compliant strategy for law enforcement managing any confrontation with persons they observe carrying handguns.[]" *Hicks*, 2026 WL 1601794, at *49 (Leahy, J., concurring) (alteration added).

I readily conclude that defendant was subjected to a lawful *Terry* stop.

**3.**

I next consider the legality of the search of the vehicle.

After defendant was seen displaying the handgun, he entered the driver's side of a black Honda. As the officers approached the scene, with emergency vehicle lights activated, Detective St. Surin saw defendant making furtive movements in his car. St. Surin can be heard on his BWC making comments to that effect. Officer Klein testified that, because defendant was believed to be armed, for officer safety, Fallin was removed from the vehicle, handcuffed, and frisked. During the frisk, however, no gun was recovered from defendant's person, despite the fact that defendant had been seen displaying a gun. Once the defendant was removed from his car, the BPD began to search the vehicle.

As mentioned, in the context of a *Terry* stop, the law seems to regard an armed individual as a dangerous one. The Supreme Court has recognized that a policeman making an investigatory stop "should not be denied the opportunity to protect himself from attack by a hostile suspect" and "may conduct a limited protective search for concealed weapons." *Adams v. Williams*, 407 U.S. 143, 146 (1972). Of pertinence here, the Court said that the frisk for weapons may be reasonable "whether or not carrying a concealed weapon violated any applicable state law" *Id.*; *see Mimms*,

434 U.S. at 112 (stating that the bulge in the defendant's jacket entitled the officer to conclude that the defendant "was armed and thus posed a serious and present danger to the safety of the officer"); *Terry*, 392 U.S. at 28 (recognizing that an armed person presents a threat to officer safety); *United States v. Robinson*, 846 F.3d 694, 700 (4th Cir. 2017) (en banc) (recognizing that an armed person poses a danger justifying a frisk).

*Michigan v. Long*, 463 U.S. 1032 (1983), is also informative. There, the Supreme Court said: "When the officer has a reasonable belief 'that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.'" *Id.* at 1047 (quoting *Terry*, 392 U.S. at 24).

The same is so here. I readily conclude that the frisk was lawful, for the reasons articulated in the cases cited above. But, as noted, no gun was found, even though defendant had been seen displaying one. This implicates the decision of BPD to search the car.

Of import, the Court said in *Long* that *Terry* "need not be read as restricting the preventative search to the person of the detained suspect.[]" *Long*, 463 U.S. at 1047. The Court "recognized that suspects may injure police officers and others by virtue of their access to weapons, even though they may not themselves be armed." *Id.* at 1048. It ruled, *id.* at 1049: "These principles counsel our conclusion that the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the

66

suspect is dangerous and the suspect may gain immediate control of weapons.[]" (citing *Terry*, 392 U.S. at 21).

*Griffin*, 589 F.3d 148, is also instructive.  In that case, the Court held that officers who made a *Terry* stop were justified under *Long* to conduct a protective search of the defendant's vehicle.  *Id.* at 150.  In *Griffin*, a credible informant told the police that the defendant, the sole occupant of the vehicle, had a gun.  *Id.* at 151.  The police initiated a traffic stop under *Terry*, frisked the defendant, and, out of concern for his own safety, handcuffed the defendant and put him in the backseat of the police car.  *Id.*  Some bystanders and the informant were on the scene, near the vehicle.  *Id.* at 151, 153.  Thereafter, the officer searched the passenger compartment of the defendant's vehicle and found a pistol on the driver's side floorboard.  *Id.* at 151.  The defendant was arrested.  *Id.*

Of relevance, despite the fact that the defendant in *Griffin* was "restrained in the backseat of the police vehicle at the time of the search," the Court determined that it was merely a *Terry* stop, and the defendant could have been released.  *Id.* at 154.  If so, the defendant "would have regained access to his vehicle and any weapon inside."  *Id.*  The *Griffin* Court concluded that the government satisfied the "second prong" of *Long*, "concerning the possibility that the suspect might gain immediate control of any weapons inside the vehicle . . . ."  *Id.* at 154; *see also United States v. Elston*, 479 F.3d 314, 320 (4th Cir. 2007) ("[A] protective search is authorized even if the suspect is under police restraint . . . because the suspect may . . . later regain access to the vehicle if he is not arrested"); *Holmes*, 376 F.3d at 276 (recognizing that in *Long*, 463 U.S. at 1051-52, the Supreme Court "rejected the argument that an officer has no reasonable basis for believing that a suspect may gain control of a weapon in his vehicle when the suspect is outside of the vehicle and

under an officer's 'brief control'"; the suspect, if not arrested, "could lawfully reenter his car at the conclusion of the stop and gain access to any weapons inside while the police are still nearby.")

Here, the BPD officers had ample ground to believe that defendant possessed a handgun and to frisk him. Yet, no gun was found during the frisk. It was also reasonable for the BPD officers to believe that the gun might be hidden in the defendant's car. Indeed, as noted, when the police approached the defendant, he was seen in the driver's seat of the Honda, moving about and reaching back. This kind of furtive movement, coupled with the fact that the defendant had been seen with the gun, permits the inference that defendant was trying to hide the gun in the car.

It is also noteworthy that the vehicle was located on a City street in proximity to a store. The BWC of Sergeant Wagner and the photograph at ECF 38 at 5 show a man on the street, in close proximity to defendant's vehicle. The vehicle was not locked, and it was accessible to the public, which put both the police and the public at risk if a gun were in the vehicle.

Moreover, although defendant was handcuffed, he was not yet under arrest. And, if he were permitted to return to the vehicle, he would have had easy access to a gun if one were in the car, thereby potentially endangering the police and others. Notably, the search of the vehicle was quite brief. The vehicle was searched for about two and a half minutes before the gun was found. And, a little more than three minutes elapsed from the outset of the stop until the gun was found. Further, the search was limited to the passenger compartment of the vehicle.

In my view, it would have been foolhardy for the police not to search the passenger compartment of defendant's vehicle for the gun that had been seen in defendant's possession just a few minutes earlier. *See Long*, 463 U.S. at 1049 n.14; *see also New York v. Belton*, 453 U.S. 454 (1981). The search of the vehicle was lawful under *Terry*, *Long*, and their progeny.

68

## IV. Statement Motion

### A.

Defendant asserts, ECF 38 at 1:[24]  "The primary issue now for the Court to resolve is whether Mr. Fallin's Fifth Amendment rights were violated with respect to statements he made before the gun was found because he was 'interrogated' by Baltimore City Polic Department (BPD) officers while 'in custody' without being read his *Miranda* warnings."    Fallin    notes that he is not seeking to suppress any statements that he made after the gun was recovered. *Id.* at 2; *see id.* at 9 n.1.

Fallin posits: "The core question is whether or not Mr. Fallin was 'in custody' for *Miranda* purposes under the Fifth Amendment." *Id.* at 2.  He asserts that, under *Miranda* and its progeny, a person is in custody when, under the totality of the circumstances, his "'freedom of action is curtailed to a degree associated with formal arrest.'" *Id.* at 3 (citations and some internal quotation marks omitted).  Moreover, he claims that "no reasonable person in Mr. Fallin's position would have felt that he was free to leave and terminate the interrogation." *Id.* at 7.

Defendant provides several reasons to support his view that he was in custody when Detective Klein posed five questions to him at the inception of the stop. *Id.*  He points out*, id.* at 1-2, 5-6, that armed police officers blocked his car on all sides, "preventing him from leaving"; "7 BPD officers surrounded" defendant's car, "yelling in a loud and authoritative tone"; the BPD

---

[24] Fallin initially filed a skeletal motion to suppress the statements he made at the scene. ECF 31.  He complained generally of the failure of BPD to advise him of his *Miranda* rights, 384 U.S. 436.  He also asserted that he was in custody, his statements were involuntary, and they were made in response to questions "likely to elicit an incriminating response . . . ." *Id.* at 1.  Defendant provided a more fulsome discussion in his reply.  ECF 38.

officers were wearing tactical vests and had their guns drawn; two BPD officers reached into defendant's car, grabbed his wrists, restrained the defendant and removed him from the car; defendant was then handcuffed.

The government disputes that defendant's initial detention amounted to an arrest. ECF 34 at 30-32. It states, *id.*: "Just because an individual is detained by police does not mean that person is under arrest." *Id.* at 31. Moreover, the government contends that the handful of questions that BPD posed to defendant did not require *Miranda* warnings.

The Fifth Amendment provides, in part: "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. In *Miranda v. Arizona*, 384 U.S. 436, 444, 467-68, 471 (1966), the Supreme Court determined that, when an individual is subjected to custodial interrogation, procedural safeguards are required. In particular, the Supreme Court ruled that, prior to custodial interrogation, members of law enforcement must inform an individual who is in custody of his Fifth Amendment rights.

Specifically, prior to questioning, an individual interrogated while in police custody "'must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'" *Berkemer v. McCarty*, 468 U.S. 420, 429 (1984) (quoting *Miranda*, 384 U.S. at 444). Even if a defendant is advised of his *Miranda* rights, the Court must determine whether the defendant knowingly and voluntarily waived his rights under the Fifth Amendment. *Dickerson v. United States*, 530 U.S. 428, 444 (2000). A waiver of rights must be knowing and intelligent. *See, e.g., United States v. Cristobal*, 293 F.3d 134, 142 (4th Cir. 2002). Unless a defendant in custody is advised of his rights and voluntarily waives them, any incriminating statements made during custodial interrogation must be suppressed. *United States v. Ivey*, 60 F.4th 99, 112 (4th Cir. 2023);

70

*United States v. Giddins*, 858 F.3d 870, 879 (4th Cir. 2017); *United States v. Holmes*, 670 F.3d 586, 591 (4th Cir. 2012).

The government bears the burden to show that the warnings were provided, that the accused understood his rights, and the accused made an uncoerced, voluntary, and informed statement. *See*, *e.g.*, *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010); *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *Lego v. Twomey*, 404 U.S. 477, 482-84 (1972); *Giddins*, 858 F.3d at 881.   But, a statement that follows *Miranda* warnings will "[r]arely" be deemed involuntary.  *Dickerson*, 530 U.S. at 444.

The voluntariness inquiry under the Due Process Clause of the Fifth Amendment and the voluntariness inquiry as to a *Miranda* waiver are largely the same.   *Connelly*, 479 U.S. at 169; *Cristobal*, 293 F.3d at 140.   The test to determine whether a statement was voluntary under the Due Process Clause "is whether the defendant's will has been 'overborne' or his 'capacity for self determination critically impaired.'"   *United States v. Pelton*, 835 F.2d 1067, 1071 (4th Cir. 1987) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)); *see Dickerson*, 530 U.S. at 444; *Giddins*, 858 F.3d at 881;   *Cristobal*, 293 F.3d at 140; *United States v. Braxton*, 112 F.3d 777, 780-81 (4th Cir. 1997) (en banc).[25]

---

[25] Voluntariness is not an issue here.  But, in general, a defendant's relinquishment of the right "must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception."  *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *see Connelly*, 479 U.S. at 167; *Cristobal*, 293 F.3d at 139-140; *see also Dickerson*, 530 U.S. at 434; *United States v. Umana*, 750 F.3d 320, 344 (4th Cir. 2014); *United States v. Gray*, 137 F.3d 765, 771 (4th Cir. 1998).  As the *Cristobal* Court said, 293 F.3d at 140, "Coercive police activity is a necessary predicate to a finding that a confession is not 'voluntary' within the meaning of the Due Process Clause. . . ."  *See Connelly*, 479 U.S. at 167; *Colorado v. Spring*, 479 U.S. 564, 574 (1987); *Giddins*, 858 F.3d at 881.  Similarly, coercive police conduct "is also a necessary predicate to a finding that a waiver of *Miranda* rights is not voluntary."  *Cristobal*, 293 F.3d at 141.  In deciding whether a defendant's will has been overborne, or his capacity for self determination critically impaired, courts look to the totality of the circumstances.  This, in turn, requires

It is pellucid that the application of *Miranda* is triggered only in a custodial setting, and only when an individual in custody is subjected to interrogation. *Miranda*, 384 U.S. at 441, 444; *see Montejo v. Louisiana*, 556 U.S. 778, 794 (2009); *Yarborough v. Alvarado*, 541 U.S. 652, 660 (2004); *Ivey*, 60 F.4th at 112; *Giddins*, 858 F.3d at 879; *see also Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam) (concluding that law enforcement officials are not required to administer *Miranda* warnings to everyone they question). "'[I]nterrogation' includes not only 'express questioning' but also its 'functional equivalent' -- 'words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *Grueninger v. Dir., Va. Dep't of Corr.*, 813 F.3d 517, 527 (4th Cir. 2016) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980)); *see also Ivey*, 60 F.4th 99, 112 (4th Cir. 2023); *Bernard*, 927 F.3d at 806. This focuses on "the perceptions of the suspect, rather than the intent of the police." *Innis*, 446 U.S. at 301; *see Bernard*, 927 F.3d at 806-07 (concluding that officer's invitation to cooperate was reasonably likely to induce defendant to incriminate himself, and was "the functional equivalent of interrogation" that "triggered the need for *Miranda's* protection," but finding harmless error).

"The *Miranda* custody inquiry is an objective test." *Yarborough*, 541 U.S. at 667; *see J.D.B. v. North Carolina*, 564 U.S. 261, 271 (2011). "When determining whether an interrogation is custodial for purposes of *Miranda*, 'a court asks whether, under the totality of the circumstances, a suspect's freedom of action was curtailed to a degree associated with formal arrest.'" *United States v. Azua-Rinconada*, 914 F.3d 319, 325-26 (2019) (citing *United States v. Hashime*, 734 F.3d 278, 282 (4th Cir. 2013)) (internal quotations, brackets, citation omitted); *see Berkemer*, 468 U.S.

---

consideration of the particular characteristics of the defendant, the circumstances and setting of the interview, and the details of the interrogation. *Cristobal*, 293 F.3d at 140.

at 440; *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam); *Giddins*, 858 F.3d at 879, 880 n.6. The inquiry "asks whether a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Hashime*, 734 F.3d at 282-83; *see Thompson v. Keohane*, 516 U.S. 99, 112-13 (1995); *Giddins*, 858 F.3d at 879. The determination is a mixed question of law and fact. *Thompson*, 516 U.S. at 112-13.

For purposes of the Fifth Amendment, the concept of "custody" does not necessarily require a formal arrest. "[T]he ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Beheler*, 463 U.S. at 1125; *see Mathiason*, 429 U.S. at 495; *Hashime*, 734 F.3d at 282; *United States v. Hargrove*, 625 F. 3rd 170, 178 (4th Cir. 2010), *cert. denied*, 565 U.S. 899 (2011). Put another way, "'custodial interrogation'" means "'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *Yarborough*, 541 U.S. at 661 (quoting *Miranda*, 384 U.S. at 444).

Notably, "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994) (per curiam); *see J.D.B.*, 564 U.S. at 271. Indeed, "the subjective views of a police officer who effects a detention have no bearing on whether that detention constitutes an arrest." *Elston*, 479 F.3d at 319; *see United States v. Parker*, 262 F.3d 415, 419 (4th Cir. 2011) ("Custody determinations do not depend on the subjective views of either the interrogating law enforcement officers or of the person being questioned but depend instead [on] the objective circumstances of the interrogation."). Rather, "[t]he relevant inquiry is how a reasonable man would have understood the suspect's position at

73

the time." *Parker*, 262 F.3d at 419; *see also J.D.B.*, 564 U.S. at 271; *Berkemer*, 468 U.S. at 442; *United States v. Colonna*, 511 F.3d 431, 435 (4th Cir. 2007).

Of significance here, the Fourth Circuit has recognized that "[a] brief but complete restriction of liberty" is not necessarily an arrest. *Elston*, 479 F.3d at 319. In other words, merely because a suspect is the focus of a law enforcement inquiry does not mean that he or she is in custody for *Miranda* purposes. The determination of custody is made by examining "all of the circumstances surrounding the interrogation" and determining "how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action.'" *Stansbury*, 511 U.S. at 325 (quoting *Berkemer*, 468 U.S. at 440).

For a seizure to amount only to a detention, it must not last "longer than necessary to verify or dispel the officer's suspicion." *United States v. Leshuk*, 65 F.3d 1105, 1109 (4th Cir. 1995). Moreover, the actions of the police officers must have been "necessary to protect their safety, maintain the status quo, and confirm or dispel their suspicions." *Id.* at 1110; *see United States Hill*, 471 Fed. App'x 143, 154 (4th Cir. 2012).

Facts relevant to the custody determination include, but are not limited to, "'the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant.'" *Hashime,* 734 F.3d at 283 (quoting *United States v. Day*, 591 F.3d 679, 696 (4th Cir. 2010)) (other citations omitted); *see Giddins*, 858 F.3d at 880; *Black*, 707 F.3d at 537-38. Physical restrictions and the suspect's isolation and separation from family are also pertinent. *Hashime,* 734 F.3d at 283. Yet, the Fourth Circuit has also "recognized that 'drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily

74

elevate a lawful stop into a custodial arrest.'" *Elston*, 479 F.3d at 320 (citing *United States v. Leshuk*, 65 F.3d 1105, 1109-10 (4th Cir. 1995)).

**B.**

As noted, whether a person is under arrest or, instead, subjected merely to a temporary detention, turns on whether "'the suspect's freedom of action is curtailed to a degree associated with formal arrest.'" *Elston*, 479 F.3d at 319 (quoting *Park v. Shiflett*, 250 F.3d 843, 850 (4th Cir. 2001)); *see Hill*, 471 Fed. App'x at 154. "This is a two-part inquiry, one pertaining to time and the other to scope." *Hill*, 471 Fed. App'x at 154.

In *Elston*, 479 F.3d at 319, the defendant argued that his detention constituted "a full arrest" and not a mere detention. Of relevance, the defendant in *Elston* was ordered out of his truck and handcuffed by a police officer whose service weapon was drawn. *Id.* at 316. Noting that the police "reasonably suspected that Elston was armed and dangerous," *id.* at 320, the Fourth Circuit concluded that the "techniques" used by the officers to effect the detention did not transform the *Terry* stop into an arrest. *Id.* at 320. The Court regarded as "immaterial" the defendant's claim that no reasonable person would have felt free to leave under the circumstances. *Id.* at 319. The Court reasoned that *Terry* permits "[a] brief but complete restriction of liberty . . ." *Id.* And, of relevance here, it observed that the defendant's weapon was located "almost immediately" after he was detained. *Id.* at 320.

Moreover, and of significance, the Court concluded that the police made a lawful *Terry* stop, not an arrest, despite the fact that weapons were drawn and the defendant was handcuffed. Among other things, the Fourth Circuit observed that the detention lasted no longer than necessary to verify the officer's suspicion. *Id.*

*Leshuk*, 65 F.3d 1105, is also instructive.  There, the defendant was convicted of aiding and abetting the manufacture of marijuana, in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1). *Id.* at 1106.  Deputy Sheriffs were directed to a concealed site in the woods with multiple marijuana plants and located Leshuk and Smith.  *Id.* at 1107.  The deputies frisked both men, who were asked about the contents of two backpacks and a garbage bag.  Both denied ownership.  *Id.*  A search revealed a machete, shovels, fertilizer, and marijuana plants.  *Id.*

Among other things, the defendants sought to suppress their statements, arguing that the deputies conducted a custodial interrogation without providing *Miranda* warnings.  *Id.* at 1108. The Fourth Circuit concluded that the deputies conducted a lawful *Terry* stop.  *Id.* at 1109.  It reasoned: "'The perception . . . that one is not free to leave is insufficient to convert a *Terry* stop into an arrest.  A brief but complete restriction of liberty is valid under *Terry*.'"  *Id.* (citation omitted).

Indeed, the Court recognized that "*Terry* stops customarily involve 'detentions where the person detained is not technically free to leave while the officer pursues the investigation.'"  *Id.* (citation omitted).  Noting that *Terry* stops "must last no longer than necessary to verify or dispel the officer's suspicion" (*id.*, citing *Royer*, 460 U.S. at 500), the *Leshuk* Court said, 65 F.3d at 1109-10:  "From these standards, we have concluded that drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for *Miranda* purposes."  Further, the Court observed, *inter alia*, that the *Terry* stop was "necessary to protect [officer] safety" and to "confirm or dispel [the officers'] suspicions."  *Id.* at 1110.  Moreover, said the Court, the deputies' "inquiry about the contents of the garbage bag and backpacks was reasonably related to the purpose of the stop . . ."  *Id.*

76

These cases help to inform my analysis.  There is no question that the officers surrounded defendant's car with guns drawn.  But, the guns were pointed towards the ground and never pointed at the defendant.  They were also reholstered as soon as the defendant was handcuffed, if not earlier.  Detective Klein explained that guns were drawn and defendant was handcuffed for safety reasons, because the officers believed defendant had a gun.  But, once defendant was secured, the guns were holstered.

To be sure, the police blocked defendant's car, removed him from his vehicle, handcuffed him, and frisked him.  But, such conduct does not necessarily transform the stop into an arrest.

Careful consideration inescapably leads to the conclusion that, when the BPD initially seized the defendant, the BPD conducted a *Terry* stop, not an arrest.  The conduct of the police in drawing their weapons, removing the defendant from his car, handcuffing him, and frisking him was reasonable in light of legitimate safety concerns, because the police had been told that defendant had displayed a handgun.  The initial detention and ensuing vehicle search were reasonable in scope and duration.  Detective Klein's BWC reflects that Klein told the defendant he was stopped because he was seen with a gun.  And, only a handful of questions were directed to the defendant.  Critically, the questions were related to the investigatory purpose of the stop.

As discussed, C.L. § 4-206(a) permits a police officer to "make an inquiry" if the officer, "in light of the [his] observations, information, and experience, reasonably believes that:  (i) the person may be wearing, carrying, or transporting a handgun in violation of § 4-203 . . . ." (ii) because the person possesses a handgun, he may be dangerous to the officer of others; (iii) obtaining a search warrant is "impracticable" under the circumstances; and (iv) "swift measures are necessary."  Under such circumstances, the police officer may, among other things, "ask any question . . . that may be reasonably calculated to determine whether the person is unlawfully

wearing, carrying, or transporting a handgun in violation of § 4-203. . . ." *See* C.L. § 4-206(a)(2)(iv). The statutory provision lends support to the conclusion that the BPD conducted an investigatory *Terry* stop, not an arrest, when defendant was initially stopped, removed from the vehicle, handcuffed, and frisked.

Defendant also asserts a violation of his rights under the Sixth Amendment. But, defendant has not identified the basis of an alleged violation of the Sixth Amendment.

The Sixth Amendment provides several vital protections to a criminal suspect. For example, under the Sixth Amendment, a defendant enjoys, *inter alia*, the right to a speedy and public trial by jury and to the assistance of counsel. A defendant is also entitled to be informed of the charges against him. A criminal defendant's right to counsel attaches after judicial proceedings have been initiated against him. *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991); *United States v. Williamson*, 706 F.3d 405, 416 (4th Cir. 2013). That right applies at all critical stages. *Rothgery v. Gillespie Cnty.*, 554 U.S. 191, 212 (2008).

Defendant has not identified a Sixth Amendment violation. Nor have I discerned one. The Court cannot guess at defendant's contentions.

### V. Conclusion

For the reasons set forth above, I conclude that both the Evidence Motion (ECF 33) and the Statement Motion (ECF 31) lack merit. Therefore, I shall deny the Evidence Motion (ECF 33) and the Statement Motion (ECF 31).

An Order follows.

Date:  June 11, 2026                                                          /s/
                                                                      Ellen L. Hollander
                                                                      United States District Judge